TAYLOR *v.* MERCANTILE-SAFE DEPOSIT AND TRUST COMPANY, Executor-Personal Representative of the Estate of Richard H. Hodgson

[No. 296, September Term, 1972.]

*Decided July 27, 1973.*

532

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*John B. Robins*, with whom were *Robins, Robins & Johnson* on the brief, for appellant.

*Fulton P. Jeffers*, with whom were *Hamilton P. Fox, James P. Bailey* and *Hearne, Fox & Bailey* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

In the unusual facts in this case we have testimony by an individual that he knew nothing of an assignment of a mortgage to him, that a subsequent assignment of that mortgage purportedly by him was not in fact signed by him, that he only recently has learned of a chancery sale reported in his name, that he paid no part of the purchase price of that property, that he learned 36 years after the fact that title to the real estate stood in his name as a result of an

assignee's deed from that sale, and that he, as a member of the bar, was induced more than 40 years ago by a then circuit judge to enter into a partnership with a non-lawyer real estate agent by which he was to share the profits from the real estate business and the real estate agent was to share the profits derived by him from his professional activities as a lawyer.[1]

Mercantile-Safe Deposit and Trust Company as personal representative of the estate of Richard H. Hodgson (Hodgson) appears here as appellee and cross-appellant. It filed a bill of complaint in the Circuit Court for Wicomico County against appellant and cross-appellee, Levin Paul Taylor (Taylor), praying that a resulting trust might be declared in its favor as to certain real estate in Wicomico County appearing in the name of Taylor among the land records of that county.

A mortgage was assigned to Taylor on December 24, 1932. Under date of January 7, 1933, an assignment of that mortgage to a Wicomico County attorney "for the purpose of foreclosure" appears in the record. Thereafter the attorney proceeded to sell. The report of sale stated that Taylor was the purchaser at public sale on February 4, 1933, for the sum of $2600. The sale was finally ratified by the circuit court on November 10, 1933. Under date of October 24, 1933, the assignee conveyed the land to Taylor. The deed was not recorded, however, until March 31, 1944. At that time it was mailed by the clerk of the circuit court to Hodgson, from which the inference is drawn that Hodgson was responsible for its recordation. Additional facts were succinctly summarized by the chancellor in his opinion:

> "Mr. Hodgson, of course, is no longer here to testify and neither are the grantor, Mr. Seth Taylor, nor the witness, Miss Livingston. [Miss Livingston was said to have been Hodgson's secretary for 51 years prior to her death "[a]round Thanksgiving of 1969."] However, Mr. Merrill Eversman, a certified

---

1. This sharing of income is certainly improper now, if not at that time.

public accountant who had prepared Mr. Hodgson's tax returns for twenty years, testified that Mr. Hodgson's business records showed the subject property as part of a listing of the Hodgson properties. This list was prepared in 1952 to show location, name, how and when acquired, original cost, cost of improvements, tax assessment, rents collected, depreciation, and other factors necessary for the preparation of Mr. Hodgson's tax returns. The subject property was shown on this list as having been purchased in No. 4334 Chancery on October 25, 1933, for $2,600.00 cash. Mrs. Eleanor Hearn, Mr. Hodgson's secretary at the time of his death, testified Mr. Hodgson kept in his desk a list of all his properties and the subject property was included on that list, valued by him at $8,500.00. Tax bills for the property were sent to Levin P. Taylor in care of Mr. Hodgson. Mr. Hodgson paid the taxes on the property and collected the rents from it from 1933 until the time of his death. He reported the income from the property on his income tax returns. The deed was found in his safe deposit box after his death. This exercise of dominion and control over the property by Mr. Hodgson, coupled with Mr. Taylor's testimony that he did *not* pay the purchase price, lead inescapably to the conclusion that Mr. Hodgson did." (Emphasis in original.)

A decree was passed holding that the deed to Taylor "created a resulting trust in and to the property therein conveyed for the benefit of Richard H. Hodgson for his lifetime" and "that upon the death of Richard H. Hodgson, the beneficial interest in said property became vested in Levin Paul Taylor . . . ." The bill of complaint was then dismissed. Both sides appealed.

The questions presented are the right of a defendant to appeal when a bill of complaint is dismissed; the application of the "dead man's statute," Code (1957) Art. 35, § 3; and

whether there was a resulting trust. Since we conclude there was no error, we shall affirm the decree of the chancellor (Pollitt, J.) on these questions.

Hodgson's personal representative has moved to dismiss Taylor's appeal. It claims that since the complaint has been dismissed in its entirety and the complainant ordered to pay the costs, no appeal will lie. Taylor says his appeal was filed out of an abundance of caution because he has pending in the Circuit Court for Wicomico County a suit against the Hodgson estate for rents and profits realized from the property here in controversy. If the court decree holding that there was a resulting trust during Hodgson's lifetime were permitted to stand, then, as Taylor states, any chance he might have of recovery in that civil suit would be destroyed. Since there was a partial finding in favor of the complainant, the decree should not have dismissed the proceeding and Taylor does have a right of appeal to us. Therefore, the motion to dismiss must be denied.

A second preliminary matter is a holding relative to the "dead man's statute." [2] Taylor was called as a witness for the plaintiff, Hodgson's personal representative. On direct examination he testified that he practiced law in Wicomico County "[f]rom January, 1927, until July, 1929," and that Hodgson, his half brother, was his "associate." [3] It was specified that Hodgson was a realtor, not a lawyer. Taylor was then led through the situation relative to this property, that he was not aware of the sale, that he did not attend the sale, that he did not purchase the property, that he did not put up any money to purchase the property, that he was

---

**2.** Code (1957) Art. 35, § 3 provides in pertinent part:

"In actions or proceedings by or against executors ... of a decedent as such, in which judgments or decrees may be rendered for or against them, ... no party to the cause shall be allowed to testify as to any transaction had with, or statement made by the testator ... personally ..., unless called to testify by the opposite party, or unless the testimony of such testator ... shall have already given in evidence, concerning the same transaction or statement, in the same cause, on his or her own behalf or on behalf of his or her representative in interest...."

**3.** Taylor was admitted to practice before this Court on December 14, 1926.

not "aware of" parting "with any consideration with regard to the property," that prior to the death of Hodgson he collected no rents from the property, that he did not know and never saw the long time tenant of the property, and that he never owned any real estate in Salisbury. He stated that "[u]ntil 1967" his son, a lawyer, resided in Hodgson's home. Taylor knew nothing of the deed to him until December 24, 1969. At that time a water bill for the property sent to Levin Paul Taylor in care of Hodgson was missent to Taylor's son, Paul, who notified his father that he was the legal owner of the property. On cross-examination he was again interrogated relative to the mortgage. Questions then elicited from him the information that his and Hodgson's uncle, a then circuit judge, suggested that Taylor come to Salisbury to practice law, "to go in with [his] brother," Hodgson, the uncle, having given "a rosy picture of the financial future," and it being agreed that Hodgson would get half of what Taylor earned as an attorney and Taylor would get half of what Hodgson earned from his real estate business. The record then is:

"Q. Did it work out that way? A. No, sir.

"Q. How did it work out? A. I got half of what I earned, that's all, and I didn't get one cent from his real estate transactions.

"Q. Do you know of any reason why this mortgage might have been put in your name and the property later conveyed to you in your name? A. The only thing I can think, Mr. Robins, is that when I went to him, my brother, and complained about—

"Q. Which brother are you referring to? A. Mr. Hodgson. Mr. Richard H. Hodgson.

"So, I went to him, Mr. Richard H. Hodgson, and I complained about that I wasn't getting —

"(Mr. Fox) I am going to object to this, Your Honor. I think this is far afield. And then there is the 'dead man's statute' for one thing.

"(The Court) The 'dead man's statute' would

apply, except you called him as your witness, Mr. Fox.

"(Mr. Fox) I don't think that because I asked him about his relationship with Mr. Hodgson that that opens the door for anything that would —

"(The Court) You asked him if he was associated with Mr. Hodgson when he came to practice law in Salisbury, and he said he was, and I think that opened the door.

"(Mr. Fox) Your Honor, I must strongly urge that I have not waived the 'dead man's statute.' If I understand it correctly, you have to question the witness about transactions that the witness had with the deceased person. The fact that you establish that he practiced law as an attorney certainly does not go into any transactions between the two of them.

"I would strongly urge upon the Court that this comes a long way short of waiving the 'dead man's statute.'

"Just because he practiced law with the man certainly does not —

"(Mr. John Robins) Yes. And we suggest that he didn't object when we were establishing this relationship, Your Honor, and when we —

"(The Court) His objection is probably late, that's true.

"But the 'dead man's statute' is waived when the witness is called by the other party.

"When he is then questioned about his association with the other party, then he is entitled to go ahead and explain that association.

"I will overrule the objection."

An exception is contained in Code (1957) Art. 35, § 3 for the situation where an individuàl is "called to testify by the opposite party ...." This testimony came in on cross-examination. It was within the scope of the direct

examination. Thus, it was admissible. *Leahy v. McManus,* 237 Md. 450, 206 A. 2d 688 (1965), and *Cooper v. Davis,* 226 Md. 371, 174 A. 2d 144 (1961).

At least as far back as *Dorsey v. Clarke,* 4 H. & J. 551 (1819), our predecessors recognized that where one purchases land, pays for it with his own money, and takes a conveyance in the name of another, a trust results in favor of the purchaser, unless there be circumstances rebutting that presumption. The authorities relative to this doctrine were recently reviewed in *Lacey v. VanRoyen,* 259 Md. 80, 267 A. 2d 91 (1970). In *Battle v. Allen,* 250 Md. 672, 245 A 2d 590 (1968), Judge Marbury said for the Court:

> "A resulting trust is one which exists because of the inferred or presumed intention of the parties where the terms of the disposition or accompanying facts establish that the beneficial interest is not to go with legal title. *Siemiesz v. Amend,* 237 Md. 438, 206 A. 2d 723. Since the law creates a strong presumption in favor of the legal title as evidenced by a deed, *Mountford v. Mountford,* 181 Md. 212, 29 A. 2d 258, a person who attempts to establish a resulting trust has the burden of proving such trust by plain, unequivocal, and convincing evidence. *Siemiesz v. Amend, supra; Fasman v. Pottashnick,* 188 Md. 105, 51 A. 2d 664. Indeed, this Court has stated that the evidence must be so clear and strong as to remove every reasonable doubt as to the existence of the trust. *Gray v. Harriet Lane Home,* 192 Md. 251, 64 A. 2d 102; *Sands v. Church, Etc.,* 181 Md. 536, 30 A. 2d 771. Parol evidence may be sufficient to establish a resulting trust, but the court will view it with great caution because it impeaches a document executed according to law and recorded as evidence of title. Any other rule would disturb the reliance which the public places upon land title instruments. *Siemiesz v. Amend, supra; Fitch v. Double 'U' Sales Corp.,* 212 Md. 324, 129 A. 2d 93." *Id.* at 675-76.

On the subject of evidence Bogert, *Trusts and Trustees* (2d ed. 1964) § 454 states:

"Very commonly statements by the payor of the consideration or the grantee are offered to rebut the trust presumption or confirm it. What the payor said as to his intent before or at the time of the deed should be admissible and have considerable weight, whether these statements were in favor of a trust or a gift. After the deed has been delivered, it would seem that the payor's statements which tend to show a gift intent should be receivable as admissions against interest, but that his declarations that he was the owner of an interest in the property should not be received, since they are self-serving. Statements by the grantee that he was to hold in trust, and had himself no beneficial interest, made before or at the time of the deed or afterward, would seem clearly admissible to aid the presumption of a trust. But it would seem impossible for the grantee, by his own self-serving declarations, to overcome the presumption of a trust, arising from the nature of the transaction.

"The conduct of the parties with relation to the possession of the realty and the benefits and burdens thereof, after the delivery of the deed, is important as corroborating or contradicting the presumption of a trust. If, with consent of the grantee, the payor enters into possession, takes the rents and profits, and pays taxes and other carrying charges, and reports the income of the property on his income tax returns, naturally there will be strong support for the presumption of a trust for the payor as the intended result; while the opposite will be the effect of the assumption of all the appearance and incidents of ownership by the grantee with the knowledge and acquiescence of the payor." *Id.* at 525-27.

It is recognized that in rebutting the resulting trust it may be rebutted in part and that it may be shown that the payor intended that the transferee should have a partial beneficial interest in the property, a resulting trust arising in favor of the payor as to the balance of the beneficial interest. For instance, the payor may manifest an intention that the transferee should have a beneficial interest in the property after the death of the payor. In such case there is a resulting trust for the payor to the extent to which the transferee is not given a beneficial interest. *See* Restatement (Second), *Trusts* § 441 (1959), Comment *f,* and 5 Scott, *The Law of Trusts* § 441.3 (3d ed. 1967).

The burden of proof is on the party seeking to establish the trust, in this instance upon Hodgson's personal representative. It may be inferred from the combination of the inventory of property mentioned by the accountant and Hodgson's secretary, together with the data in that inventory referring to the exact chancery number, the date of the deed, and the amount of purchase price reflected in the actual report of sale, coupled with possession of the deed with the further inference from the fact that the deed was returned to him that Hodgson had the deed recorded, that indeed Hodgson did pay for the property. In such circumstance, as noted in *Lacey* at page 86 of 259 Md., quoting from *Powell v. Mackenzie,* 137 Md. 266, 112 A. 290 (1920), in the absence of facts explanatory of the circumstances, a resulting trust arises in favor of the persons supplying the purchase money. As there noted, however, an exception to the rule applies "where the person supplying the purchase money is under a natural, moral or legal obligation to provide for the person taking the title," in which case "the purchase is to be considered as an advancement or a settlement as the case may be . . . ."

It is strongly suggested by the personal representative that under the authorities a half brother is not sufficiently close in relationship to come within the exception. This argument overlooks the moral obligation existing as a result of the abortive partnership where Taylor "got half of what [he] earned," but not one cent from the real estate

transactions, with the comment when Hodgson was faced with this situation, "[m]oney is very tight. There's two people around here who make it very difficult for me to get money, but, one of these days the table is going to be turned and things will be different then." Of course, one might infer that no money was made in the real estate business. Volume does not necessarily mean net income. On the other hand, the then circuit judge who was an uncle of both parties and who occupied "an office there at the end of the suite which he used when he wasn't in court," when Taylor was on the way to Annapolis to be admitted to practice before this Court told Taylor "he wanted [him] to come to Salisbury to go in with" Hodgson and then "went on to tell [Taylor] about what money [Hodgson] was making, and he gave [Taylor] a rosy picture of the financial future." From the fact that the testimony showed Hodgson's secretary who died around Thanksgiving in 1969 to have been that secretary for 51 years prior to that time, it may be concluded that Hodgson was established in the real estate business at least by the fall of 1918, meaning that when Taylor went to Salisbury in January, 1927, Hodgson had already been in business eight years. From all of this an inference could be drawn that there might well have been sums of money due Taylor not paid to him for one reason or another, including the possibility that the "two people around [t]here who ma[d]e it very difficult for [Hodgson] to get money" in some way interfered, such as by insisting that this income be reinvested. By today's standards the sum due Taylor might have been small, just as a $2600 purchase price for a house seems small, the modesty of the time being reflected in the salary of the state's attorney for Wicomico County then set at $1400, see Code of Public Local Laws (1930) Art. 23, § 396, where it had been since passage of Chapter 651 of the Acts of 1912, compared with the salary of $10,000 now specified for the state's attorney of that county in Code (1957, 1972 Cum. Supp.) Art. 10, § 40(w). Also, in that time the presence of that silent partner, the Internal Revenue Service, did not manifest itself until a much higher level of income was reached than is the case today.

It would have been helpful if counsel had seen fit to

introduce into evidence the listing of properties concerning which and from which the accountant and secretary testified, but from the testimony of the secretary that the listing of rental property covered "5 yellow sheets," her further statement that during the time she worked for Hodgson he collected rent from no property other than those he owned himself, and the accountant's testimony that the "computer listing" used by the accountant for income tax preparation purposes showed this property as "Item No. 74," the inference may be drawn that Hodgson was indeed the owner of a substantial amount of real estate, even though those properties may have been modest, as this one apparently was.[4]

That there was no real barrier between Taylor and Hodgson may be gleaned from the fact that when Taylor's son went to Salisbury to practice law almost 40 years after his father went there, the son lived in Hodgson's home. We regard it as of more than passing significance that although more than 38 years passed from the time of purchase of this property to the death of Hodgson, this owner of numerous parcels of real estate took no action of any kind to have title transferred into his own name.[5] When this is coupled with the relationship of the parties and the moral obligation growing out of the abortive partnership, we conclude under Maryland Rule 886 that it cannot be said that the chancellor was clearly in error in his conclusion from the evidence that although a resulting trust was established, proof went only to the extent of showing an intention on Hodgson's part to retain a life estate.

As previously stated, the decree must be modified to the extent it dismissed the bill of complaint.

> *Motion to dismiss denied; decree modified as herein directed and as modified, affirmed; appellant and appellee each to pay one-half of the costs.*

---

4. At oral argument counsel for the Hodgson estate said the number of properties owned by Hodgson "in and about Wicomico County" probably "was in excess of 100."

5. Counsel for the estate said at argument that Hodgson died March 5, 1971.