The UNITED STATES of America

v.

The DISTRICT OF COLUMBIA; and
the Department of General Services,
District of Columbia.

Civ. No. HM84–696.

United States District Court,
D. Maryland.

Oct. 10, 1984.

F. Henry Habicht, III, Asst. Atty. Gen., Dept. of Justice, Land & Natural Resources Div., Pamela S. West, Atty., Dept. of Justice, Washington, D.C., J. Frederick Motz, U.S. Atty., for the Dist. of Md., William D. Quarles, Asst. U.S. Atty., Baltimore, Md., for plaintiff.

Inez Smith Reid, Corp. Counsel, D.C., John H. Suda, Principal Deputy Corp. Counsel, D.C., Martin L. Grossman, Deputy Corp. Counsel, D.C., Roberta L. Gross, Asst. Corp. Counsel, D.C., Washington, D.C., Ronald W. Fuchs, Resident Counsel, D.C., Baltimore, Md., Anthony S. Borwick, Chief Counsel for Litigation, Office of Gen. Counsel, GSA, Washington, D.C., for defendants.

## MEMORANDUM

HERBERT F. MURRAY, District Judge.

This case arises out of the inability of the United States and the District of Columbia

("District") to resolve their dispute over the ownership of the Glenn Dale Hospital property, a parcel of real property and improvements located in Prince George's County, Maryland. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1251(b)(2) or § 1345. The matter is currently before the court on cross motions for summary judgment.

*Introduction*

The piece of property at issue in this case is a two hundred acre tract of improved land in Prince George's County, Maryland. The parties agree that the United States acquired legal title to the property from Margaret R. Sharman, widow, by deed dated August 14, 1930 and from Daniel B. Lloyd and his wife by deed dated September 4, 1930. The United States took title to the property pursuant to Public Law Nos. 70–873, 45 Stat. 1425 (1929), and 71–144, 46 Stat. 218 (1930). Public Law No. 70–873 is now codified at D.C.Code Ann. § 32–113 (1981). It reads as follows:

Children's Tuberculosis Sanatorium— Construction and equipping authorized. The Mayor of the District of Columbia is authorized to acquire, by purchase, condemnation, or otherwise a site, and to cause to be constructed thereon, in accordance with plans and specifications approved by such Mayor, suitable buildings and structures for use as a Children's Tuberculosis Sanatorium, including necessary approaches and roadways, heating and ventilating apparatus, furniture, equipment, and accessories.

Congress later amended the statute by increasing the authorization of appropriation from $500,000 to $625,000 and making a provision for the then-Commissioners to acquire land for the sanatorium outside of the District. The amendment reads as follows:

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that section 2 of the Act of Congress approved March 1, 1929, entitled 'An Act to provide for the construction of a children's tuberculosis sanatorium' is hereby amended by increasing the sum authorized to be appropriated to carry out the provisions of this Act from $500,000 to $625,000, or so much thereof as may be necessary, to be appropriated in like manner as other appropriations for the District of Columbia.

That if the land proposed to be acquired as a site for the said sanatorium is without the District of Columbia *the title to said property shall be taken directly to and in the name of the United States* .... (emphasis supplied)

46 Stat. 218 (1930).

Subsequently, the District took possession and proceeded to construct a number of buildings on the property including two hospital units, thirteen units used to house doctors and other medical personnel, and several support buildings. It operated and maintained the property as a medical facility until 1981. Since that time the property has been vacant. The District of Columbia remains in possession and considers itself to be responsible for maintenance of the property.

The instant controversy began in late 1980, just prior to the time when the Mayor of the District ("Mayor") determined that it was not economically feasible to renovate Glenn Dale for continued use as a medical facility. In a series of letters between the Mayor's office and the Regional Administrator of the Federal General Services Administration ("GSA"), the parties each asserted rights to the soon to be vacant property. GSA argued that the United States held legal title and that the District was in possession only under a conditional grant to use the property as a medical facility. In response, the District argued that it had equitable title by virtue of the legislative history of the authorizing legislation and its improvement and maintenance of the property. Paper # 1, ex. C–1 *et seq.* The District also asserted that, although it did not believe it could sell the Glenn Dale land without Congressional approval, it did have authority to lease the property to private parties. *Id.*

The District did attempt to lease Glenn Dale in November 1982. The Department of Justice and the District's Corporation Counsel later reached an agreement that the District would suspend its leasing efforts pending further research and discussion between the parties. To this end the Department of Justice provided the GSA with a legal opinion concluding that the District had no authority to lease. The District's legal officials voiced their disagreement with that opinion and indicated their intention to readvertise the property for lease. Paper # 1, ex. E–1 *et seq.* The District proceeded to list the property as available for long term lease in local newspapers in November and December 1983.

The United States responded by instituting the instant suit. On February 28, 1984, the United States filed a verified complaint for ejectment under the applicable Maryland statute, Md.R.P.Code Ann. § 8–402. After evaluating the complaint, the court signed an order ejecting the District from the disputed property, enjoining any further attempts to lease the property, and requiring that the District show cause, in writing, why a writ of possession should not issue. The District filed a pleading denominated "response and answer" on April 12, 1984. In addition, on May 13, 1984, it filed a motion to dissolve the injunction contained in the court's show cause order and to expedite further proceedings. By letter to counsel dated May 7, 1984, the court directed counsel for the United States to proceed with a motion for preliminary injunction. That motion was filed on May 21, 1984. By memorandum and order dated June 8, 1984, the court denied the motion for preliminary injunction and vacated the *ex parte* injunction entered on March 12, 1984. It then directed the parties to proceed with cross motions for summary judgment. A hearing on those motions was held on July 20, 1984.

*Cross Motions for Summary Judgment*

In its cross motion the United States asks the court to declare it has a right to possess, use, and enjoy the Glenn Dale property, to order the defendant to vacate the property, to enjoin the defendant from leasing the property to third parties and to otherwise interfere with the United States' property rights, and to award costs to the United States. Paper # 11. In its motion the District urges the court to deny relief to the plaintiff and to award summary judgment in its favor. Paper # 12. It asks also that the court declare the District has equitable title and rights to possess and use the property.

Rule 56(c) requires the court to enter summary judgment in favor of the moving party where

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The court finds that, while the parties disagree as to the legal interpretation of a number of material facts, the facts themselves are not in issue. Accordingly, the court will make findings of fact and then proceed to determine which party is entitled to judgment as a matter of law.

1. *Findings of Fact*

A. The relationship between the federal government and the District of Columbia

1. Under Article I, Section 8, Clause 17, Congress has the power:

To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States.

U.S. CONST. art. I, § 8, cl.17.

2. In 1791, the District of Columbia was designated as the nation's capital. Paper # 8, ex. G. (REPORT OF THE COMMISSION ON THE ORGANIZATION OF THE GOVERNMENT OF THE DISTRICT OF COLUMBIA, U.S. Government Printing Office, Washington, 1972, p. 3.)

3. In 1802, Congress incorporated the City of Washington and provided it a local government structure with a mayor appointed by the President of the United States and a city council elected directly and indirectly by the voters. *Id.* at 6.

4. In 1871, Congress created one municipal government, a territorial-type government, to replace the municipal governments of the separate entities of Georgetown, the City of Washington and the County of Washington. The territorial government consisted of a governor who was appointed by the President; a bicameral legislature with a Council, appointed by the President, and a House of Delegates, elected by District voters; and a Board of Public Works consisting of the governor, as chairman, and four persons appointed by the President. *Id.* at 7.

5. In 1874, Congress abolished the previous District government and established a temporary government which consisted of three presidentially appointed commissioners and an officer of the Department of the Army Engineer Corps. *Id.* at 8.

6. In 1878, Congress established the form of District government which endured until 1967. It consisted of three presidentially appointed commissioners, one of whom was an officer from the Army Corps of Engineers. The District operated under this system at the time of the Glenn Dale purchase. *Id.*

7. In 1967, Congress established a Mayor-Commissioner-Council form of government for the District to replace the presidentially appointed Board of Commissioners. *Id.*

8. In 1973, Congress enacted the District of Columbia Self-Government and Governmental Reorganization Act of 1973, Pub.L. No. 93-198, 87 Stat. 774 (1973). This Act:

> delegated many authorities to an elected government, but did not change some of the fundamental relationships between the District and Federal governments.

Congress, for example, maintains ultimate legislative authority over the District and must still enact annual appropriations for the entire budget, as well as determine the Federal payment.

Paper # 8, ex. F. (FY 1984: FEDERAL PAYMENT, District of Columbia Government, April 1983, p. 1.[1]

9. The present form of government for the District was established by the District of Columbia Self-Government and Governmental Reorganization Act.

**B. The federal payment**

1. Between 1790 and 1878, Congress provided no consistent level of annual support to the government of the District. During this period, governmental activities within the District were funded from locally generated taxes and varying levels of appropriation by Congress for specific District projects. STAFF OF HOUSE COMM. ON THE DISTRICT OF COLUMBIA, 96TH CONG., 1ST SESS., THE FEDERAL PAYMENT TO THE DISTRICT OF COLUMBIA: 1790–1980: A REFERENCE COMPENDIUM OF DOCUMENTS, STUDIES, REPORTS, AND PROPOSALS (Comm.Print 1979), 1–10.

2. Between 1878 and 1925, Congress continued to appropriate funds for specific District projects, but also made '50–50' annual payments to the account of the District in the U.S. Treasury in this manner:

> *The District of Columbia Organic Act* of 1878 (20 Stat. 102) *provided that all locally raised revenue derived from municipal taxes in the District of Columbia would be deposited in the Federal Treasury. In turn, Congress would appropriate these locally raised revenues and match them dollar for dollar with federal revenues derived from federal taxes* levied on all citizens of the United States. This procedure was known as the 50–50 District of Columbia budget funding arrangement and

---

**1.** The federal payment is an annual appropriation by Congress to the District of Columbia to compensate the District for revenue loss from

federally owned properties which are not subject to District taxation. *See infra* part B.

remained in force until the 1920's when it was replaced by the present lump sum federal payment arrangement.

*Id.* at 13. (Emphasis supplied).

3. In 1925, Congress initiated the lump sum annual federal payment to the District of Columbia which is still in effect. Under this arrangement, Congress appropriates local District of Columbia tax revenue and an annual lump sum federal payment for the District budget. It breaks down this total amount into separate appropriations for specific projects. *Id.* at 15–17.

4. In 1929, the lump sum annual federal payment to the District of Columbia was $9,000,000.00. Act of May 21, 1928, Ch. 659, 45 Stat. 645–683 (1928). This federal payment and locally generated District revenues were to cover: General Expenses, Contingent and Miscellaneous Expenses, Street and Road Improvement and Repair, Sewers, Collection and Disposal of Refuse, Public Playgrounds, Electrical Department, Public Schools, Metropolitan Police, Police and Firemen's Relief Fund, Fire Department, Health Department, Courts and Prisons, Public Welfare, Militia, Anacostia River and Flats, Public Buildings and Public Parks, National Capital Park and Planning Commission, National Zoological Park, and Water Service. *Id.*

5. In 1930, the lump sum annual federal payment to the District of Columbia was $9,000,000.00. Act of February 25, 1929, Ch. 314, 45 Stat. 1262–1299 (1929). This federal payment and locally generated District revenues were to cover: General Expenses, Contingent and Miscellaneous Expenses, Street and Road Improvement and Repair, Sewers, Collection and Disposal of Refuse, Public Playgrounds, Electrical Department, Public Schools, Night Schools, Metropolitan Police, Policemen and Firemen's Relief Fund, Fire Department, Health Department, Courts and Prisons, Public Welfare, Militia, Anacostia River and Flats, Public Buildings and Public Parks, National Capital Park and Planning Commission, National Zoological Park, and Water Service. *Id.*

6. Appropriations for Glenn Dale Hospital fell under the "Public Welfare" heading. *See e.g.* 45 Stat. 1291 (1930).

C. The Glenn Dale authorization legislation

1. By the Act of March 1, 1929, in separate authorization, Congress provided for the construction of a children's tuberculosis sanatorium. Act of March 1, 1929, Ch. 422, 45 Stat. 1425 (1929). This Act provided:

> *Be it enacted by the Senate and the House of Representatives of the United States of America in Congress assembled,* That the *Commissioners of the District of Columbia are authorized to acquire,* by purchase, condemnation, or otherwise, *a site, and to cause to be constructed thereon,* in accordance with plans and specifications approved by such commissioners, *suitable buildings and structures for use as a children's tuberculosis sanatorium,* including necessary approaches and roadways, heating and ventilating apparatus, furniture, equipment, and accessories.
>
> SEC. 2. *There is authorized to be appropriated the sum of $500,000,* or so much thereof as may be necessary, to carry out the provisions of this Act, to be appropriated in like manner as other appropriations for the District of Columbia.

*Id.* (Emphasis supplied).

2. By the Act of April 18, 1930, in separate authorization, Congress amended its previous Act for the construction of a children's tuberculosis sanatorium. Act of April 18, 1930, Ch. 186, 46 Stat. 218–19 (1930). By this Act, Congress provided:

> That section 2 of the Act of Congress approved March 1, 1929, entitled *"An Act to provide for the construction of a children's tuberculosis sanatorium,"* is hereby amended by increasing the sum *authorized* to be appropriated to carry out the provisions of this Act *from $500,-000 to $625,000,* or so much as may be necessary, to be appropriated in like manner as other appropriations for the District of Columbia.

That *if the land proposed to be acquired as a site for the said sanatorium is without the District of Columbia the title of said property shall be taken directly to and in the name of the United States,* and in case a satisfactory price cannot be agreed upon for the purchase of said land, the Attorney General of the United States, at the request of the Commissioners of the District of Columbia, shall institute condemnation proceedings to acquire such land as may be selected for such site either in the State of Maryland or in the State of Virginia in accordance with the laws of said States, and expenses of procuring evidence of title or of condemnation, or both, shall be paid out of the appropriation herein made for the purchase of said site.

*Id.* (Emphasis supplied).

D. The Glenn Dale appropriation legislation (1930–1940)

1. The District of Columbia Appropriation Act for fiscal 1931, 46 Stat. 981, Chap. 848 (July 3, 1930, contains a number of specific appropriations for Glenn Dale including $74,800 for salaries; $59,000 for fuel, forage, vehicles, clothing and the like; $10,000 for repairs and improvements; and $75,000 for purchase of a site. Paper # 14, ex. A

2. The District of Columbia Appropriation Act, 46 Stat. 1405, Chap. 282 (Feb. 23, 1931), contains the following specific appropriations for Glenn Dale: $80,080 for salaries; $60,000 for fuel, forage, vehicles, clothing and the like; $23,500 for repairs; and $250,000 for construction of suitable buildings. *Id.*

3. The District of Columbia Appropriation Act for fiscal 1933, 47 Stat. 372 (June 29, 1932) contains the following specific appropriations for Glenn Dale: $240,000 for the completion of erection of suitable buildings. *Id.*

4. The District of Columbia Appropriation Act for fiscal 1934, 48 Stat. 245 (June 16, 1933), contains the following specific appropriations for Glenn Dale: $25,000 for personal services, maintenance and necessary expenses; and $45,000 for furnishing and equipment and the purchase of a vehicle. *Id.*

5. The District of Columbia Appropriation Act, 48 Stat. 870 (June 4, 1934), contains the following specific appropriations for Glenn Dale: $51,498 for salaries; $30,000 for provisions, fuel, forage and the like; and $2,000 for repairs. *Id.*

6. The District of Columbia Appropriation Act for fiscal 1935, 49 Stat. 365 (June 14, 1935), contains the following specific appropriations for Glenn Dale: $77,410 for salaries; $67,000 for provisions, fuel, forage and the like; $2,000 for repairs; and $40,000 for purchase of furniture and equipment. *Id.*

7. The District of Columbia Appropriation Act for fiscal 1937, 49 Stat. 1880 (June 23, 1936), contains the following specific appropriations for Glenn Dale: $116,350 for salaries; $85,000 for provisions, fuel, forage and the like; and $2,000 for repairs. *Id.*

8. The District of Columbia Appropriation Act, 50 Stat. 218 (May 28, 1937), contains the following specific appropriations for Glenn Dale: a reappropriation of the unexpended balance of $80,000 from the fiscal 1937 appropriation. *Id.*

9. The District of Columbia Appropriation Act for fiscal 1938, 50 Stat. 376 (June 29, 1937) contains the following specific appropriations for Glenn Dale: $325,440 for salaries; $203,000 for provisions, fuel and the like; and $13,000 for repairs and improvements. *Id.*

10. The District of Columbia appropriations acts for subsequent years contain similar line item appropriations for Glenn Dale. *See e.g.* 52 Stat. 174–75 (April 4, 1938); 53 Stat. 1022 (July 15, 1939); 54 Stat. 323 (June 12, 1940). *Id.*

11. Each of the aforementioned appropriations acts contains an introductory paragraph indicating that the money to finance the specific budget items is derived from two sources: Local District of Columbia tax revenues deposited in the U.S. Treasury; and a specific amount of general

federal revenue commonly known as the "federal payment." *See* Paper # 14, ex. D.

### E. Actual purchase and improvement of the Glenn Dale property

1. By deeds, pursuant to the Acts of March 1, 1929 and April 18, 1930, the United States acquired a site for the children's tuberculosis sanatorium in Prince George's County, Maryland. Act of March 1, 1929, Ch. 422, 45 Stat. 1425 (1929); Act of April 18, 1930, Ch. 186, 46 Stat. 218–19 (1930). On August 14, 1930, Mrs. Margaret Sharman, a widow, conveyed to the United States a portion of the site for the consideration of $42,650. *See*, Land Records: Prince George's County, Maryland; Deed taken from Liber 359 at Folio 16 (1930). (Copy attached to Paper # 1). Another portion of the site was acquired by the United States from Daniel E. Lloyd and Anna Belle Lloyd, husband and wife, on September 4, 1930 for the consideration of $15,250. *See* Land Records: Prince George's County, Maryland; Deed taken from Liber 359 at Folio 18 (1930). (Copy attached to Paper # 1).

2. Pursuant to the provisions of the Act of April 18, 1930 which authorized $625,000 for site acquisition, construction of buildings and structures, approaches and roadways installation of heating and ventilating apparatus; and provision of furniture, equipment and accessories, the children's tuberculosis sanatorium (Glenn Dale Hospital) was established on the Prince George's County site and opened in 1934. Paper # 14, ex. C.

3. Between 1930 and the 1983 fiscal year, in total, the United States of America contributed $3,796,735,292 in federal payments to the budget of the District of Columbia. A portion of these federal tax dollars was used for all necessary expenses, maintenance and improvements at the Glenn Dale Hospital. Paper # 8, ex. F. *See also,* STAFF OF HOUSE COMM. ON DISTRICT OF COLUMBIA, 96TH CONG. 1ST SESS., THE FEDERAL PAYMENT TO THE DISTRICT OF COLUMBIA: 1790–1980: A REFERENCE COMPENDIUM OF DOCUMENTS, STUDIES, REPORTS, AND PROPOSALS at 21.

4. The District of Columbia utilized the Glenn Dale Hospital for medical purposes for several years. Paper # 14, ex. C.

5. In 1982, the Department of General Service, D.C. published a Notice–Of–Intent to Lease the Glenn Dale Hospital. The District of Columbia later withdrew this notice. *See* Paper # 1, ex. E, documents attached to the complaint.

6. In the week of December 19–23, 1983, a second Notice–Of–Intent to lease the Glenn Dale Hospital was published. *See* Paper # 1, ex. F–1, *et seq.*

7. On March 12, 1984 the United States filed a Verified Complaint for Ejectment and Writ of Assistance.

### 2. *Conclusions of Law*

The United States bases its claim that it is entitled to possession of the disputed property on the language of the deeds by which Margaret Sharman and Daniel Lloyd and his wife conveyed their property and on the language of Public Law Nos. 70–873, 45 Stat. 1425 (1929) and 71–144, 46 Stat. 218 (1930). It argues that the language of these documents reflects a conditional grant which permitted the District to use and possess the land as a tenant as long as the land was used for its intended purpose, as a tuberculosis sanatorium. In light of the fact that the property is no longer being used for any medical purpose, the United States asserts that it has become surplus property within the meaning of the Federal Property and Administrative Service Act, 63 Stat. 377, as amended, 40 U.S.C. §§ 471–484, and that the District must relinquish possession to the GSA.

The District does not dispute that the United States holds legal title to the property. Instead, it argues that legal title is not dispositive in this case. It submits that, because the property was purchased with "District monies", the United States holds the property as a purchase money resulting trustee on behalf of the District. Hence, the District is the equitable owner of the property and, as such, should be

permitted to lease or otherwise use the property in a manner in which it sees fit.

### A. Purchase money resulting trust

 A purchase money resulting trust is a type of implied trust. It occurs where one pays the consideration for a transfer of real or personal property, but has the title taken in the name of another ... [In such a case] it is presumed or inferred that the payor intended the grantee to be a trustee for the payor.

G.G. Bogert and G.T. Bogert, Law of Trusts (5th ed.) § 74 ("Bogert & Bogert"). In the absence of a federal common law of trusts, the court must look to the law of Maryland for the standards the District must meet to successfully assert a purchase money resulting trust in this case.

 In *Levin v. Levin*, 43 Md.App. 380, 405 A.2d 770 (1979), the Maryland Court of Special Appeals noted that a resulting trust rests on the presumed intent of the parties. It may arise when the consideration given for a piece of property is furnished by one party while the legal title is taken by another, provided the circumstances surrounding the transaction do not demonstrate a contrary intent. 43 Md. App. at 387, 405 A.2d 770. The party seeking to establish a resulting trust has the burden of doing so by "clear and convincing evidence." *Id.* He may meet this burden with the introduction of parole evidence, but the court will view such evidence "with great caution because it impeaches a document executed according to law and recorded as evidence of title." *Taylor v. Mercantile Safe Deposit and Trust Co.*, 269 Md. 531, 539, 307 A.2d 670 (1973). Such parole evidence may include "what the payor said as to his intent before or at the time of the deed" as well as "the conduct of the parties with relation to the possession of the realty and the benefits and burdens thereof after the delivery of the deed." 269 Md. at 540, 307 A.2d 670, *citing*, Bogert, *Trusts and Trustees* (2d ed. 1964).

 Plaintiff continues to assert, as it did in the motion for preliminary injunction, that parole evidence of the parties' actions and intentions after the conveyance should not be considered citing *Levin, Eastover Stores, Inc. v. Minnix*, 219 Md. 658, 150 A.2d 884 (1959), and *Pumphrey v. Kehoe*, 261 Md. 496, 276 A.2d 194 (1971). The statement to that effect in *Levin* is taken from an earlier Maryland Court of Appeals case, *Lacey v. Van Royen*, 259 Md. 80, 89, 267 A.2d 91 (1970). The Maryland court's more recent *Taylor* opinion contains a different view on the relevance of post-deed parole evidence. The *Eastover* and *Pumphrey* cases do not involve purchase money resulting trusts in real property and are, therefore, distinguishable. The court continues to believe that the approach outlined in *Taylor* is correct and it will consider otherwise admissible parole evidence. *See* Restatement (Second) of Trusts § 440 Comment C (1959).

The court believes there are two critical issues on which the District must prevail. First, it must show that it paid the purchase price of the Glenn Dale property in 1930. Second, it must demonstrate that, at the time of the conveyance, the parties intended the United States to hold the property in trust for the benefit of the District. It must make both of these showings by clear and convincing evidence.

### B. Source of funds for the Glenn Dale acquisition and improvements

Ordinarily, a determination of who paid the funds used to acquire a piece of property is fairly simple. In this particular case, however, that determination is made more complicated by the special relationship between the District and the federal government. In support of its position that federal funds and not "District monies" were used to purchase Glenn Dale, the United States argues that the monies in question were not raised by the District but were appropriated by Congress and designated for the Glenn Dale acquisition. The District responds that the United States' position reflects ignorance of the appropriation process for the District.

The money required to finance the District's budget comes from two sources: 1) local tax revenues collected from District residents and individuals purchasing goods within the District; and 2) a federal payment. The federal payment is a lump sum payment which the United States provides to the District in lieu of tax. The federal payment is generally understood as compensation for the erosion of the District's tax base and the use of its services by the federal government. Paper # 8, ex. F at 1, ex. G at 8, 11–12; *see generally* STAFF OF HOUSE COMM. ON THE DISTRICT OF COLUMBIA, 96TH CONG. 1ST SESS., THE FEDERAL PAYMENT TO THE DISTRICT OF COLUMBIA: 1790–1980; A REFERENCE COMPENDIUM OF DOCUMENTS, STUDIES, REPORTS, AND PROPOSALS (Comm. Print 1979), 5–22.

During the years when the Glenn Dale property was being acquired and improved, Congress approved or "authorized" line items of the District of Columbia budget. D.C. Code § 1–801 (1940). Public Law Nos. 70–873, 45 Stat. 1425 (1929) and 71–144, 46 Stat. 218 (1930) are examples of substantive authorizing legislation. Before the then-Commissioners could expend any funds for specific projects, however, Congress also had to appropriate funds for that purpose. Congress enacted appropriation legislation at least yearly. The appropriated funds came, as indicated earlier, from local tax revenues and a federal payment. The funds for Glenn Dale were appropriated as part of comprehensive District of Columbia appropriations bills. Paper # 14, ex. B.

The parties do not disagree that the underlying statutes provide for the above-described two-step process. They part company, however, over the proper characterization of the federal payment. The United States submits that the federal payment constitutes "federal money" while the District contends that it is "District money." In spite of the United States' contrary assertion, the court believes that this issue presents a question of law and not of fact.

The court has examined the various statutes establishing the federal payment and secondary sources published by both the federal government and the District. None of these sources establish any legal duty on the part of the federal government to fund a portion of the District's budget. All indicate, however, that the federal payment is compensatory, and not merely a gift. By providing a portion of the revenues required to run the city, the federal government makes up for the tremendous erosion in the District's tax base caused by the presence of large, nontaxable tracts of real estate. The federal payment also compensates for the demand on city services made by the large number of federal institutions and employees. In the early years of the republic, there was disagreement in Congress over whether the federal government should provide the District with any funds at all. This controversy has given way in the last century to a tacit acknowledgment of an equitable obligation to provide some funds to the District. The current controversy, which is also the one which prevailed at the time of the Glenn Dale acquisition, is "how much" rather than "to give or not to give."

The federal government points out that the District is not permitted to retain unexpended appropriations. It contrasts that situation with unspent federal grant monies which Congress permits the District and state recipients to retain. It concludes that, while grant money may properly be called "District money", appropriations cannot. The court does not believe the comparison is as powerful as the plaintiff suggests. In the grants context, Congress, acting in its role as a national legislature, has chosen to treat the District as a state. In the appropriations context, Congress is instead acting as a legislature for the District. In that role, it has chosen to maintain control over revenues by providing that unspent appropriations be returned to the federal treasury. In this instance the federal treasury is also the District treasury. The exercise of such control by Congress, *acting as the District's legislature,*

is not inconsistent with characterizing the federal payment as "District money."

Even assuming that the federal payment is "District money", the United States makes a further argument. It submits that the District is some sort of "federal agency" for budget purposes such that its money is really federal money. There are several problems with this line of argument. Nothing in article 1, section 8 of the Constitution indicates that the Congressional power to legislate for the District transforms the federal city into a federal agency. *John McShain, Inc. v. United States,* 179 Ct.Cl. 632, 375 F.2d 829, 831 (Ct.Cl. 1967). Even at a time when the District had less autonomy than it has today, the Supreme Court expressly held that the city was not a federal agency. In *Metropolitan Railroad Co. v. District of Columbia,* 132 U.S. 1, 7–8, 10 S.Ct. 19, 21–22, 33 L.Ed. 231 (1889), the Court said:

> [T]he counsel for the plaintiff contend that the government of the District of Columbia is a department of the United States government, and that the corporation is a mere name, and not a person in the sense of the law, distinct from the government itself. We cannot assent to this view.

There is also no statutory basis for characterizing the District as an agency. The Federal Property and Administrative Service Act, 63 Stat. 377, as amended, 40 U.S.C. § 471 *et seq.,* which authorizes the GSA to dispose of surplus federal property, treats the District as a state for purposes of receiving surplus property. *See e.g.* 40 U.S.C. § 484(j)(5). Nowhere in that Act is the District treated as a federal agency. At oral argument, counsel for the United States suggested that §§ 441–452 of the District of Columbia Self-Government and Governmental Reorganization Act, 87 Stat. 798 (1973) support the notion that the District is an agency for budgetary purposes. The court has reviewed these sections of the District charter and has concluded that they do not support the United States' position. These sections set out the procedures which the Mayor and City Council must

follow in putting together the District budget. They do not refer to the District as any species of federal property. In fact, a 1981 amendment to the definitional section of the Act negates any inference of agency status and further supports the District's position. The amendment provides, in relevant part that

> (1) The term "District revenues" means all funds derived from taxes, fees, charges, and miscellaneous receipts, *including all annual Federal payments to the District* authorized by law, and from the sale of bonds. (Emphasis supplied).

95 Stat. 1493 (1981).

■ After evaluating the statutory and interpretative evidence, the court has concluded, as a matter of law, that the federal payment is properly characterized as "District money" for purposes of the first prong of the purchase money resulting trust analysis. Since the money used to purchase and improve the Glenn Dale property was derived from both local District tax and charges revenues and a federal payment, the court finds that the District, and not the federal government, paid the total purchase price and provided funds for improvement and maintenance.

### C. The intent of the parties

In addition to demonstrating that District funds were used to purchase the Glenn Dale property, the District must also show that the parties, in this instance Congress and the District of Columbia commissioners, intended that a trust relationship arise. Parole evidence is admissible to prove intent. Such evidence may include "what the payor said as to his intent before or at the time of the deed" and "the conduct of the parties with relation to the possession of the realty and the benefits and burdens thereof after the delivery of the deed." *Taylor, supra,* 269 Md. at 540, 307 A.2d 670.

In support of its contention that Congress intended the District to be the equitable owner of Glenn Dale, the District points out that the 1929 authorizing legislation

contemplated a tuberculosis facility located within the physical boundaries of the District. That statute contained no reference to title being taken in the name of the United States. It was only after the commissioners determined that no suitable site existed within the District that Congress added the provision regarding title. Portions of a 1930 Senate report are illustrative.

It is of primary importance that before the construction of any building or buildings be discussed that consideration be given to the question of a proper site for the sanatorium. In the interest of economy, serious consideration has been given to the utilization of property already owned by the District of Columbia. The sites most frequently mentioned were land north of the Tuberculosis Hospital and at the Gallinger Hospital site. It is appreciated, that, if either of these locations were selected, there would be a saving of the purchase price of a new site and of part of the operating and supervisory expenses. The committee was impressed with these considerations and felt that, if entirely satisfactory conditions were found for the establishment of a children's tuberculosis sanatorium on District-owned property such a site would be selected... *The committee feels that there is no site in the District that would properly serve as a site for this sanatorium, and therefore recommends that a site ... be purchased.* Such a site of 100 or more acres may be obtained on the outskirts of the city or in Maryland or Virginia within 5 or 10 miles from the city limits, filling all the requirements.... (Emphasis supplied).

S.Rep. No. 263, 71st Cong., 2d Sess. 4–5 (March 12, 1930). The absence of a provision from the 1929 legislation requiring title to be taken in the name of the United States leads the District to conclude, and the court believes correctly, that Congress expected the District to take title to any property selected within its physical boundaries.

Of course, the District must explain why Congress added the title provision. In this connection, it argues that the title provision was an accommodation to the District because it allowed for the use of federal condemnation powers to acquire the land. The relevant statutory language is:

That if the land proposed to be acquired as a site for the said sanatorium is without the District of Columbia the title to said property shall be taken directly to and in the name of the United States, *and in case a satisfactory price cannot be agreed upon for the purchase of said land, the Attorney General of the United States, at the request of the Commissioners of the District of Columbia, shall institute condemnation proceedings* to acquire such lands as may be selected for said site either in the State of Maryland or in the State of Virginia in accordance with the laws of said States, *and expenses of procuring evidence of title or of condemnation, or both, shall be paid out of the appropriation herein made for the purchase of said site.* (Emphasis supplied).

46 Stat. 218.

The court believes this language supports the District's position. It clearly indicates Congress intended that the federal condemnation power be available in the event a fair price could not be negotiated. The federal condemnation power was utilized on at least one occasion to acquire additional land and easements for the Glenn Dale facility. Paper # 4, ex. A–1 *et seq.* More persuasive, however, is the portion which provides that the cost of condemnation be paid out of District appropriations. The court has already found that these appropriations constitute "District money."

The United States has not provided any plausible explanation for its assertion that Congress intended the District to have legal and equitable title to the hospital site if it was situated in the District but that the United States would have legal and equitable title in the event a Maryland or Virginia site were selected. The statute, legislative history, and subsequent conduct of the par-

ties all point to the availability of the condemnation power as the most plausible reason for the title being taken in the name of the United States. By making the condemnation power of the United States available, Congress attempted to insure that the District would make economical use of its appropriations. It also insured that the use of such powers would not be financed out of general federal revenues but out of District appropriations.

Congress has not taken any actions since 1930 with respect to the Glenn Dale property, aside from enacting yearly District appropriations bills which include funds for operation and maintenance. The only other available information on Congressional intent, therefore, is Congress' treatment of similarly situated pieces of property. The District has identified two pieces of property which it believes are analogous to Glenn Dale: Belvoir and Muirkirk.

The Belvoir tract was the second major acquisition of property for a District of Columbia prison facility in suburban Virginia. The site selected was near Mount Vernon, the home of George Washington. It was purchased in 1910 with District of Columbia appropriations and title was taken in the name of the United States. *See* Paper # 12, ex. B (Act of March 3, 1909, 35 Stat. 717). The statutory language respecting title is nearly identical to that found in the 1930 Glenn Dale legislation.

> The titles to the tracts of land .... shall be taken directly to and in the name of the United States; and in case satisfactory price cannot be agreed upon for the purchase of either or both of said tracts, or in case the title to either or both of said tracts cannot be made satisfactory to the Attorney-General of the United States, then the latter is directed to procure said tract or tracts of land by condemnation, and the expenses of procuring evidence of title, or of condemnation, or both, shall be paid out of the appropri-

ations made for the purchase of the tracts.

Act of August 5, 1909, 36 Stat. 122.

In 1912 the United States determined to take possession of Belvoir, possibly because Congress believed that the proposed prison was too close to a national shrine. The United States did not seek to regain possession as it did in the instant case. Instead, Congress enacted special legislation transferring jurisdiction [2] to the United States and appropriating some $33,000 to compensate the District for the loss of the property. The statute provided in relevant part that:

> ... There is hereby appropriated, out of any money in the United States Treasury not otherwise appropriated, the sum of thirty-three thousand dollars *to reimburse the government of the District of Columbia for the site acquired for a reformatory for the District of Columbia, which site is hereby transferred to the Secretary of War for such purposes as may be hereafter specifically authorized by Congress, and the jurisdiction now vested in the Commissioners of the District of said site*, being that certain parcel of land in the county of Fairfax, State of Virginia, known as "Belvoir" or the "White House" tract, containing fifteen hundred acres, is hereby transferred to the Secretary of War ... (Emphasis supplied).

Paper # 12, ex. E (Act of August 24, 1912, 37 Stat. 590). The District argues that the appropriation of $33,000 indicates Congressional recognition of the District's equitable title to Belvoir, and by analogy, to Glenn Dale.

The second arguably analogous property was located in suburban Maryland. Pursuant to Public Law 67–457, 42 Stat. 1327, 1358 the District, through the President of the Board of Trustees of the National Training School for Girls of the District of Columbia, acquired a tract of land in Muirkirk, Maryland for use by the National Training School for Girls. Title was taken

---

**2.** Like the Glenn Dale authorizing statutes, the original Belvoir authorization did not explicitly provide for District jurisdiction over the property.

in the name of the United States in 1923 in accordance with the following statutory language.

> ... The title to the said property shall be taken directly to and in the name of the United States; and in case a satisfactory price cannot be agreed upon for the purchase of said land, or in case the title cannot be made satisfactory to the Attorney General of the United States, then the latter is directed to acquire said tract of land by condemnation and the expense of procuring evidence of title, or of condemnation, or both, shall be paid out of the appropriation herein made for the purchase of said tract.

Paper # 12, ex. G (Pub.L. No. 67–457, 42 Stat. 1327, 1358).

The District used the Muirkirk facility as a training school until 1934. It was then used by the Department of Agriculture for reclamation work until 1942. In 1942, the War Department leased the property from the District for use as a training center. The District used the property again briefly from 1946 to 1949. Thereafter the property was unused.

In 1970 the District requested authorization from Congress to dispose of the Muirkirk property. Congress gave the District the requested authorization to sell the property pursuant to Public Law 92–196. *See* Paper # 12, ex. J.

The District has presented Congressional and GSA documents which indicate that Senator Mathias of the Senate Judiciary Committee consulted GSA about the propriety of allowing the District to sell the Muirkirk property and retain the proceeds. *See* Paper # 16 (letter from the Hon. Charles Mathias, dated Aug. 10, 1971). In his response to that letter, Harold S. Trimmer, Jr. Assistant Administrator of the GSA, indicated that the information he was able

to secure from the Office of Management and Budget ("OMB") and the District government "supports ownership in fact by the District of Columbia since the property was acquired with the funds of and for the use of that jurisdiction." *Id.* (letter from Harold Trimmer, dated Nov. 22, 1971). Mr. Trimmer informed Senator Mathias that the GSA "ha[d] no objection to the provisions of [the bill] authorizing the sale of the property for the benefit of the District of Columbia." *Id.* The committee report accompanying Public Law 92–196 indicates that Congress agreed with the GSA position. Its only stated concern in permitting the sale was whether or not the District had duly considered all other possible beneficial uses that it could make of the property. *See* Paper # 12, ex. K.[3]

In addition to its argument that parole evidence is not admissible, which the court has already addressed, the United States asserts that the Belvoir and Muirkirk cases are irrelevant to the instant inquiry. The court disagrees. The authorization and appropriation legislation which preceded the purchase of these tracts contains language which is virtually identical to that found in the corresponding Glenn Dale legislation. All three tracts were acquired when the District was operating under a commissioner form of government. All contain the reference to condemnation and stipulate that the costs of such condemnation will be paid out of District appropriations. The court believes that, in the absence of direct Congressional action regarding Glenn Dale, it is appropriate to look to action taken with respect to other properties. The court finds it particularly persuasive that, in both the Belvoir and Muirkirk cases, Congress recognized the District's equitable interests. In the former case, it enacted compensatory appropriations and in the latter,

---

**3.** The plaintiff objects to the supplemental memorandum defendant submitted with the letters discussed above. *See* Paper # 17. It has moved to strike that document. In reaching its decision on the cross motions for summary judgment the court did not consider the supplemental memorandum. It relied merely upon the stipulation and attached letters. The motion to strike is, therefore, moot. The court agrees that the additional memorandum was untimely, however, and it will grant the motion to strike.

it allowed the District to sell the property and retain the proceeds.

The court recognizes that the situation before it is not the standard situation faced by other courts in determining the existence of a purchase money resulting trust. In the usual case, the intent of both parties is crucial. Here it is the intent of Congress which is paramount. Nonetheless, the court wishes to note that there is ample and unchallenged evidence that the commissioners understood they were acquiring and improving the property as equitable owners. *See* Paper # 4, ex. B–E. In addition, the District took several types of actions over the years which are consistent with equitable ownership. It leased a portion of the Glenn Dale land to a local farmer. Paper # 4, ex. G–L. It also granted an easement to the Washington Suburban Sanitary Commission. Id., ex. M. These types of actions are not normally associated with a tenancy.

In conclusion, the court believes there is ample uncontroverted evidence that Congress intended the District to have an equitable interest in the Glenn Dale property. That interest is best characterized as a purchase money resulting trust. In the ordinary case, the successful resulting trust claimant, here the District, is entitled to a decree that the trust exists and that the trustee convey to the claimant, G.G. Bogert & G.T. Bogert, *Law of Trusts* (1973) § 75 at 281; *see also* P. Powell & P. Rohan, *Powell on Real Property* (1982) ¶ 920. The District seeks only a declaration that the trust exists and that it is entitled to possess and use the property as it sees fit until Congress legislates to the contrary. It does not seek a transfer of title. The court believes the District's request for relief is proper in light of the special circumstances of this case. It may be that Congress, acting in its role as the District's legislature, may take some action with respect to the title and possession of Glenn Dale in the future. The court's opinion in this matter is not intended to circumscribe such action.