## JOEL A. LEVIN ET AL. *v.* MARILYN S. LEVIN

[No. 1391, September Term, 1978.]

*Decided September 11, 1979.*

The cause was argued before THOMPSON, LISS and COUCH, JJ.

*Benjamin Lipsitz* for appellants.

*Theodore G. Bloom,* with whom were *Goodman & Bloom, P.A.* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Joel A. Levin (Joel), The Phoenicia Corporation (Phoenicia), and Allen Corporation (Allen), appellants, three of the five defendants below, appeal from a decree of the Circuit Court for Anne Arundel County, Turk, J., declaring that Joel's former wife, Marilyn S. Levin (Marilyn), the appellee, was entitled to equal ownership with Joel in certain assets and ordering that the appropriate interests be transferred to her.[1] The appellants contend that the chancellor erred (1) in decreeing that Marilyn owned a fifty per cent interest in Phoenicia; (2) in declaring that Marilyn owned a twenty-five per cent interest in Allen; (3) in declaring that Marilyn owned

---

1. In the decree the chancellor stated: "That the ownership in the corporate Defendant, The Allen Corporation, with respect to Edward H. Legum and Miriam Legum [the other two defendants] is hereby reserved for future determination." Although the decree did not adjudicate the rights of all the parties (See Md. Rule 605) it is nevertheless appealable under Md. Cts. & Jud. Proc. Code Ann. § 12-303 which states in part:

"A party may appeal from any of the following interlocutory orders entered by a circuit court in a civil case:

\* \* \*

(c) An order

\* \* \*

(5) For the sale, conveyance, or delivery of real or personal property or the payment of money, or the refusal to rescind or discharge such an order, unless the delivery or payment is directed to be made to a receiver appointed by the court.

(6) Determining a question of right between the parties and directing an account to be stated on the principle of such determination."

a one-half interest in the yacht "Phoenicia" and in requiring Joel to account for all assets acquired by him through the funds of Phoenicia; (4) in admitting an accountant's testimony; (5) in permitting a special auditor to present evidence to the court from outside the record; and (6) in ruling that venue was in Anne Arundel County.

Joel and Marilyn were married May 19, 1946; they had two daughters, Karen and Robin, and a son, Eric. They separated on September 13, 1975 and were divorced on November 29, 1976 by a decree of the Circuit Court No. 2 of Baltimore City. For many years prior to 1970 Joel had been engaged in the home improvement business, working in and having a one-fourth ownership interest in a corporation called Seaview Construction Company. In the latter part of 1970 Joel was separated from that enterprise. Thereafter he underwent a period of unemployment. Marilyn worked part time in a cosmetic boutique during this interval earning about $65.00 per week. In late 1970 a liquor store, known as Peoples Liquors, came to Joel's attention as a business that was for sale and which he might be able to acquire. After a period of negotiation (in some of which Marilyn participated) a contract was entered into for purchase of the business in June of 1971. Both spouses signed the contract which recited a purchase price of $55,000.00 plus the value of the inventory of the business, estimated to be $130,000.00. The contract required the buyer to pay the total sum of $65,000.00 into two escrow accounts simultaneously with execution of the agreement. Money to finance the acquisition was obtained, in part, by mortgaging the family residence which was owned by Joel and Marilyn as tenants by the entireties, which produced $20,000.00 or $30,000.00, by selling the family sailboat, which was also titled in both names and produced $12,500.00, and by borrowing from a lender called M & R Holding Company which produced $20,000.00. Notes given to M & R Holding Company in the loan transaction were signed by both Joel and Marilyn. Joel testified that other monies, including about $17,500.00, which came to him alone as a result of his separation from Seaview went into the liquor store transaction. Marilyn testified that Joel borrowed $5,000.00

from his mother "when he went to purchase Phoenicia Corporation." Joel said he borrowed it earlier. Marilyn testified that the decision to mortgage the house, sell the boat and borrow money to purchase the liquor store business was a joint decision, made after frequent discussions between her and her then husband in which the matter was considered a joint venture. She testified: "The two of us were doing it together. We were in it together from the beginning, it was a joint and equal effort."

A corporation, Phoenicia, was formed to acquire and operate the liquor store business. Phoenicia's charter was filed with the Maryland Department of Assessments and Taxation on July 26, 1971. The incorporators named in the charter were Joel and Marilyn. The directors named therein were Joel, Marilyn and their daughter, Robin. Phoenicia's principal office was located at Joel and Marilyn's then residence in Baltimore. A security agreement and financing statement incident to the transaction were signed by Phoenicia, Joel and Marilyn, as were Articles of Sale of the assets of The Peoples Liquor Company to Phoenicia, filed with the Department of Assessments and Taxation on April 13, 1972. The three persons whose names appeared on the liquor license obtained for Phoenicia were Joel, Marilyn and Robin. The same three acted as officers of Phoenicia, although no organization meeting of Phoenicia's incorporators was ever held and no stock was issued. The original lease for the liquor store premises was initially taken in the names of Joel and Marilyn as lessees. Upon its expiration a renewal lease was taken in Joel's name alone.

Joel, Marilyn, Robin, Karen and Eric all worked in the liquor store for a period of time. Marilyn waited on customers and handled the wine trade. Joel was in charge of buying and the financial aspects of the operation. Marilyn stopped working in June, 1975. Eric eventually became the manager of the store as Joel devoted time to other interests, but Joel continued to set policy and ran the business, which was very successful for a period of time. Joel borrowed substantial sums of money from Phoenicia and made investments, apparently for his own account, in real estate. He paid

interest to Phoenicia on the loans. He acknowledged his indebtedness to Phoenicia, in the amount of the balance of the loans to him shown on its books, when he testified below. Joel also loaned $30,000.00 to Phoenicia at its inception and received interest payments from the corporation.

On June 25, 1974, Joel and Edward H. Legum entered into a contract to acquire from Charles H. Steffey, Incorporated an apartment property in Annapolis known as Allen Apartments and consisting of 98 units. The purchase price was $650,000.00, including existing mortgage indebtedness. Joel was obliged to produce $50,000.00 as his contribution to funding the acquisition. He obtained most of that money by borrowing from M & R Holding Company. Marilyn cosigned on the note involved. Marilyn was not a party to the contract under which the apartments were acquired or the negotiations leading to the purchase but she testified that the decision to borrow money jointly to invest in the acquisition of the Allen Apartments was a joint decision made after discussions between her and her then husband in which they talked about their owning a one-half interest in the apartments together; the other fifty per cent was to be owned by Mr. Legum and his wife.

A corporation, Allen, was formed to acquire and operate the apartment property. Its charter was filed with the State Department of Assessments and Taxation on August 13, 1974. The incorporators named therein were Joel and Edward Legum. The directors were Joel, Legum and his wife, Miriam Legum. The same three acted as officers. Allen's principal office was located at Legum's address in Annapolis. No organization meeting of Allen's incorporators was held and no stock was issued. At settlement for the apartment property on August 29, 1974, the property was conveyed by Steffey to Allen which executed a second mortgage to Steffey to secure the unpaid balance of the purchase price. The only cash involved in this transaction was the $100,000.00 raised by the Levins and the Legums. The corporation alone assumed responsibility for the payment of the balance due. Joel signed the documents for Allen as its vice-president. Legum and Joel, but chiefly Legum, conducted Allen's day to day business.

Joel testified that in the summer of 1975 he purchased a boat, which he named "Phoenicia" and titled it in his name alone. He testified that he had no agreement with Marilyn to title the boat in both names. The purchase price was $46,500.00. He paid $25,000.00 as a down payment, which funds came from Phoenicia. The balance was borrowed under a joint obligation of Joel and Marilyn from Equitable Trust Company. He has been making the payments on the loan. Marilyn said that the decision to purchase a boat was initially her idea and that she encouraged Joel to go to Florida to look for a boat. She authorized the broker to purchase the boat when he called one Sunday and told her that the boat could be purchased for several thousand dollars more than Joel was willing to spend when he was in Florida. Marilyn said that she and Joel constantly discussed the acquisition of the yacht and that they "were doing it together from the beginning, as a joint venture." She acknowledged on her cross-examination that these discussions "were part of the normal husband-wife relationship."

Joel testified that he had never agreed to issuance of stock in Phoenicia to Marilyn, or to anyone but him, or that she should be part owner of the liquor store business. He said it was not his idea, but the seller's, to put Marilyn on the agreement for sale of that business. He also denied any agreement with Marilyn to take title to the yacht "Phoenicia" in any way which would include Marilyn. Joel also testified that he was living with Marilyn, on ordinary terms, when the Phoenicia and Allen deals were being negotiated and she did not then indicate to him that she wanted an ownership interest in either enterprise; that the first time he heard that was after they were separated.

## I Phoenicia Corporation

Appellant contends the chancellor erred in declaring that Marilyn was entitled to a fifty per cent interest in Phoenicia and in ordering that Phoenicia's stock certificates be issued accordingly. His arguments are almost totally factual insisting that we should accept his testimony instead of

Marilyn's. Under Md. Rule 1086 we must accept the chancellor's findings of fact unless they are clearly erroneous. The credibility of the witnesses was for him to determine and on appeal we must view the evidence in the light most favorable to the appellee. *Moon v. Weeks,* 25 Md. App. 322, 333 A.2d 635 (1975). Viewed in this light there was strong evidence to support the findings of the chancellor. Most, if not all, of the money used to purchase the business came from joint assets and from a loan made to the parties jointly. The lease for the business premises was in joint names and the business was purchased by Joel and Marilyn jointly. Thereafter both parties devoted full time to the business until Marilyn was required to discontinue working because of ill health. The auditor's report revealed that the applications for liquor licenses for the business from 1972 through 1976 stated that Marilyn and Joel each owned fifty per cent of Phoenicia's stock. While not determinative in themselves these documents corroborate the testimony that the liquor store enterprise was a joint venture. *Compare Smith v. Smith,* 189 Md. 1, 53 A.2d 15 (1947) *with Beard v. Beard,* 185 Md. 178, 44 A.2d 469 (1945); *Collier v. Collier,* 182 Md. 82, 32 A.2d 469 (1943); and *Gosman v. Gosman,* 19 Md. App. 66, 309 A.2d 34 (1973), *reversed in part and affirmed in part,* 271 Md. 514, 318 A.2d 821 (1974). Even though Joel may have contributed slightly more funds to the joint venture than Marilyn, the papers indicated the parties intended that their interests be equal. At least the evidence was sufficient for the chancellor to so find.

## II Allen Corporation

Appellant contends the chancellor erred in declaring that Marilyn was entitled to a twenty-five per cent interest in Allen and ordering that its stock certificates be issued accordingly. The basis for this declaration was the chancellor's conclusion that a resulting trust had been established for the benefit of Marilyn over one-half of Joel's holdings. Once again Joel's argument is primarily factual and we are required to accept the testimony most favorable to the appellee.

A resulting trust is an implied trust which rests upon the presumed intention of the parties. It may arise when the consideration given for a property is furnished by one party while the legal title is taken by another, provided the circumstances surrounding the transaction do not demonstrate a contrary intention by the parties. *Taylor v. Mercantile-Safe Deposit & Trust Co.,* 269 Md. 531, 307 A.2d 670 (1973); *Fitch v. Double "U" Sales Corp.,* 212 Md. 324, 129 A.2d 93 (1957); *Fasman v. Pottashnick,* 188 Md. 105, 51 A.2d 664 (1947). Where only a portion of the consideration is so paid a resulting trust may arise in favor of the payor

> "in such proportion as the part paid by him bears to the total purchase price, unless he manifests an intention that no resulting trust should arise or that a resulting trust to that extent should not arise." *Fasman v. Pottashnick, supra,* at 109.

The party seeking to establish a resulting trust has the burden of doing so by clear, unequivocal, and convincing evidence. *Siemiesz v. Amend,* 237 Md. 438, 206 A.2d 723 (1965); *Fitch v. Double "U" Sales Corp., supra.* Payment of the purchase price by the party claiming the benefit of the trust must have occurred either before or at the time of the purchase and

> "the transaction is to be judged as of its date, and not upon the basis of facts occurring subsequent to that date." *Lacey v. Van Royen,* 259 Md. 80, 89, 267 A.2d 91 (1970).

In the present case, the evidence showed that Joel, together with Edward Legum, determined to purchase the Allen Apartments. Allen Corporation was formed to make this acquisition. Joel and Legum agreed that they would each contribute $50,000.00 in order to make the purchase and that they would share equally in the enterprise. The remainder of the purchase price was to be paid by the corporation and it does not appear that any personal liability for that balance was incurred by any other party. Joel's portion of the required funds was raised through a loan from M & R Holding

Company to Joel and Marilyn. It is undisputed that Marilyn cosigned the note evidencing that loan. Repayment of the debt was made through the profits of Phoenicia and Allen. The chancellor found that Marilyn joined Joel in borrowing those funds only after he had persuaded her that the investment would be a good one for the two of them. The chancellor also found that Marilyn understood that she and Joel would share equally a one-half interest in the investment and these findings are supported by the evidence.

Joel now argues that "Marilyn's activities in attending settlement . . . and in signing documents there . . . are just as referable to the ordinary lender's practice of requiring spouses to join in encumbrances and security instruments as to anything tending to establish a resulting trust." This argument overlooks Marilyn's testimony and the chancellor's findings based thereon. Incurring that obligation was sufficient consideration to support a resulting trust in favor of Marilyn. *See Keller v. Kunkel,* 46 Md. 565 (1877).

Joel next argues that if a resulting trust does arise in Marilyn's favor in the assets of Allen then it must be limited to the extent of $25,000; that is, one-half of the Levins' initial investment. This reasoning does not comport with the law as stated in *Fasman v. Pottashnick, supra,* to the effect that a party furnishing only a portion of the purchase price will have a beneficial interest in the whole property in proportion to his contribution.

We repeat, the evidence presented was sufficient to support the chancellor's conclusion as to Allen.

### III The Yacht "Phoenicia" and the Loans from Phoenicia Corporation

Joel argues that the chancellor was clearly erroneous in holding that Marilyn owned a one-half interest in the yacht "Phoenicia". He relies on his own testimony that Marilyn was involved in the purchase of the yacht only in that she agreed with the broker, in Joel's absence, to pay a price somewhat higher than Joel theretofore indicated a willingness to pay. The chancellor's findings, "that the

parties intended the boat should be jointly owned" and that it was paid for by means of a loan made to both parties and funds derived from the jointly owned Phoenicia Corporation are amply supported by Marilyn's testimony. We repeat the chancellor was entitled to believe Marilyn's testimony and to disbelieve that of Joel. Under the principles discussed above, the chancellor was correct in imposing a resulting trust in favor of Marilyn on a one-half interest in the yacht.

Joel next argues that it was error for the chancellor to require him to account for all assets acquired by him with or through Phoenicia loans and funds and to impress a constructive trust on all other assets acquired by him with Phoenicia funds and upon the liquor store lease.

The record shows that Joel borrowed almost $100,000.00 from Phoenicia, drawing checks upon the corporate funds either to himself or in payment of personal obligations. He stated that the borrowings were without the knowledge or approval of the directors of the corporation and without any form of corporate resolution or authority. Indeed, the evidence shows that Joel treated the corporation as an alter ego, handling its funds as if they were his own.

In *Carter v. Abramo,* 201 Md. 339, 343, 93 A.2d 546 (1953), the Court said:

> "A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another person on the ground that he would be unjustly enriched if he were permitted to retain it. The duty to convey the property may arise because it was acquired through fraud, duress, undue influence, or mistake, *or through a breach of fiduciary duty,* or through wrongful disposition of another's property. *Springer v. Springer,* 144 Md. 465, 125 A. 162; *Lipp v. Lipp,* 158 Md. 207, 148 A. 531; *O'Connor v. Estevez,* 182 Md. 541, 555, 35 A.2d 148; *Trossbach v. Trossbach,* 185 Md. 47, 42 A.2d 905; *Fasman v. Pottashnick,* 188 Md. 105, 51 A.2d 664. The equity court imposes a constructive trust upon either real or personal

> property by parol evidence on the ground of public policy under the equitable doctrine that the Statute of Frauds, which was enacted for the purpose of preventing fraud, should not operate as a shield for the perpetration of fraud. *Soehnlein v. Pumphrey,* 183 Md. 334, 37 A.2d 843." (Emphasis added.)

Although Joel was never officially elected president because the corporation never held meetings, he held himself out and acted as the president, and he was in fact and law one of three directors of the corporation. We think this is sufficient to impose upon him the fiduciary obligations of such an officer and director; thus he occupied a confidential relation to the corporation. *Merchants Mtge. Co. v. Lubow,* 275 Md. 208, 339 A.2d 664 (1975); *Waller v. Waller,* 187 Md. 185, 49 A.2d 449 (1946); *Pritchard v. Myers,* 174 Md. 66, 197 A. 620 (1938). As an officer and director of Phoenicia, Joel bore the same obligations to it as an agent bears to his principal and a trustee bears to the beneficiaries of his trust. *Pritchard v. Myers, supra.* In dealing with corporate assets he was required to act in the best interests of the corporation and he was prohibited from using either his position or the corporation's funds for his private gain. *Carey v. Safe Deposit & Trust Co.,* 168 Md. 501, 178 A. 242 (1935); *Cumberland Coal & Iron Co. v. Parish,* 42 Md. 598 (1875).

Joel argues that the loans were openly made and reflected in the corporate books. He also states that some of the loans have been repaid with interest and that he planned to repay the remainder. Such circumstances, even if believed by the chancellor, do not dispel the need for an accounting and the imposition of a constructive trust on assets acquired by Joel with Phoenicia funds. As the authorities cited above make clear it was a breach of Joel's fiduciary duty to appropriate corporate funds to his own use without authorization by the corporation. It is settled that

> "A trustee will not be allowed to retain for himself a profit made from his dealings with trust property, although he is able to show that the profit was not made at the expense of the trust." *Carey v. Safe Deposit & Trust Co., supra,* at 514.

We find that principle applicable to the present case.

It should be pointed out that fraud is not essential for the imposition of a constructive trust; it is sufficient if the conscience of the chancellor requires granting such relief. *Grimes v. Grimes,* 184 Md. 59, 40 A.2d 58 (1944); *Hartsock v. Strong,* 21 Md. App. 110, 318 A.2d 237 (1974). This, of course, does not mean the chancellor is free to impose a constructive trust without regard to established legal and equitable principles.[2] The present case, however, is clearly within such principles and calls for the imposition of such a remedy. *See Acker, Merrall & Condit Co. v. McGaw,* 106 Md. 536, 556, 68 A. 17 (1907).

## IV Accountant's Testimony

Joel claims the chancellor committed error in requiring his accountant to testify over objections based on the accountant-client privilege.[3] The major portion of the testimony pertained to the corporate affairs of Phoenicia and

---

2. In determining whether creditors could attach an unassigned right of dower the Court of Appeals in Harper v. Clayton, 84 Md. 346, 35 A. 1083 (1896) pointed out that

"a Court of Equity, however broad and far-reaching its powers are, cannot create new rights, not before existing at law, and then take jurisdiction to pass upon and enforce them because the law affords no remedy." 84 Md. at 352-53.

Later in the same opinion the Court said:

"Whatever may, at one time, have been the vague and general rule as to the limits and extent of equity jurisdiction, it is now well settled that 'no Court of Chancery at this day would attempt to supply the defects of law by deciding contrary to its settled rules in any manner, to any extent, or under any circumstances, beyond the already settled principles of equity jurisprudence.' 1 *Pomeroy Eq. Jurisp.* section 47." 84 Md. at 353.

3. Md. Cts. & Jud. Proc. Code Ann. § 9-110 provides:

"(a) *Privilege.* — A certified public accountant, public accountant, or any person employed by him may not disclose the contents of any communication made to him by a person employing him to examine, audit, or report on any book, record, account, or statement nor may he disclose any information derived from the person or material in rendering professional service unless the person employing him or his personal representative or his successor in interest permits it expressly.

"(b) *Exception.* — This privilege does not affect the criminal laws of the State or the bankruptcy laws."

to joint income tax returns of Joel and Marilyn. It seems obvious that Marilyn, as a director of Phoenicia and as one of the parties involved in the income tax returns, had as much right to the records, or to waive the accountant's privilege, as did Joel. The accountant was also asked to identify certain corporate records of the Allen Corporation but this testimony could have been obtained from any officer and no privilege attached to the corporate records. The error, if any, was not prejudicial.

## V Special Auditor

Appellants object to that portion of the report of the special auditor which contained the following language:

"Inquiry made of the Board of Liquor License Commissioners, resulted in their submission of copies of application for Renewal of a Class A — Alcoholic Beverage License for the years 1972 through 1978 (Attachment 8). The names of the licensee(s) on all documents submitted herewith list Joel A. Levin, Marilyn Levin and Robin Levin. These documents (1972-1976 inclusive) state, under oath, that Marilyn and Joel A. Levin, each own 50 percent of the stock of the Phoenicia Corporation, T/A Peoples Liquor Company. The 1977 application states that Joel A. Levin and Marilyn S. Levin are the sole stockholders. The 1978 application states that Joel A. Levin owns 100 percent of the stock.
\* \* \*

"All Applications for Renewal of Alcoholic Beverage Licenses for the years 1972 to 1978 contain the name of Marilyn Levin as one of the three licensees listed. These applications further state in notarized statements signed by Marilyn, Joel A., and Robin Levin, that Marilyn Levin and Joel A. Levin each own 50 percent of the stock for the years 1972 to 1977. There was no indication of any payments to Marilyn Levin, other than her salary by the corporation, through the fiscal year ending April 30, 1976, when she received only $900 or $100 per week for 9 weeks.

There was objection on this ground below and the trial court ruled:

> "[T]here was testimony here that the — that the liquor license was in both names from the time it instigated to the date we were taking testimony, and that the Court had instructed the auditor to obtain copies of the liquor licenses to insure that both names were on it. And it was under this Court's instructions that the auditor did obtain those licenses and present them to this Court.
>
> "The Court sent out notices and the file was available for counsel to look at and the Court could ask the auditor to make himself available in the event that he would be — should be subpoenaed to defend here, as a result the Court's going to grant the Motion Ne Re, and as a result thereby will deny the Motion for Exceptions."

Md. Rule 595 b provides that a special auditor shall have all the powers and duties of a regular auditor. Subsection e provides as follows:

> "The auditor shall regulate all the proceedings in every hearing or examination before him. In addition to his power to examine the parties and witnesses produced by them, on oath, he may require the production of all books, papers and other documents applicable thereto, where, by a court of equity, the production of such writings may be compelled. If any party so liable to produce such books, papers or other documents, shall fail or refuse so to do, such party shall, without delay, be reported to the court by the auditor, with the facts of the case, that the proper proceeding may be taken thereon, by way of attachment for contempt or otherwise, as justice may require."

We see no error in the ruling of the chancellor.

## VI Venue

Appellant Phoenicia argues that because it has its principal office in Baltimore City and conducts no business in Anne Arundel County, the Circuit Court for Anne Arundel County did not have venue. Phoenicia concedes that Courts Art., § 6-201 (b) provides that when one of the defendants is subject to suit in Anne Arundel County, all of the defendants are subject to suit in Anne Arundel County, but argues that that statute should not be applied in this case because it is entitled to have its case tried in Baltimore City under Maryland Declaration of Rights Art. 20. No constitutional question was presented below and thus we decline to consider it. Md. Rule 1085.

*Decree affirmed.*
*Appellants to pay the costs.*