REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2096

September Term, 2013

_____

TROY T. BRYANT

v.

ROXANNA K. BRYANT

_____

Eyler, Deborah S.,
Kehoe,
Nazarian,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: October 30, 2014

*Judge Kevin F. Arthur did not participate,
pursuant to Md. Rule 8-605.1, in the Court's
decision to report this opinion.

Troy Bryant ("Husband") appeals four of the Circuit Court for Anne Arundel County's many decisions in a divorce proceeding initiated by his (now ex-)wife, Roxanna Bryant ("Wife"). He claims that the trial court abused its discretion when it awarded Wife indefinite alimony, and that it erred in finding that payments he characterizes as "loans" made to him by his employer constituted income during the marriage, and therefore marital property for purposes of calculating indefinite alimony. He also argues that the court wrongly failed to create a "constructive trust" or other vehicle to vest him with a full ownership interest in property at issue in the divorce, even though it was titled in Wife's name. Finally, he appeals the trial court's finding that he was in contempt after he failed to pay child support. Wife filed a cross-appeal arguing that the court relied on an incorrect alimony figure when it calculated child support. We find no errors and affirm.

## I. BACKGROUND

### 1. The marriage and the parties' careers.

Husband and Wife were married on June 26, 1992 and had two children, both of whom are now over the age of eighteen. Although neither Husband nor Wife graduated from college, both have had successful careers. After serving in the Marines, Husband worked as a financial advisor for several institutions, and he accepted his current position with UBS in 2010. His salary agreement with UBS was complex, and the subject of much disagreement by the parties.

Husband entered into a Letter of Understanding with UBS on November 8, 2010, under which he received what the Letter characterized as a "cash loan" or "transition loan"

in the amount of $1,305,000 within thirty days. Husband also signed a series of "Transition Agreements" and promissory notes with UBS on November 17, 2010 and thereafter. Unlike more conventional loans, UBS made "payments" (by forgiving one-ninth of each loan) on Husband's anniversary dates with the company as long as he continued to work there, and they would be forgiven in full after nine years.[1] Husband took the position at trial that the "loans" were, in fact, loans, not signing bonuses or compensation, because after the divorce he would remain responsible to repay them, and in any event they could not be considered "property acquired during the course of the marriage" (the term of art that we discuss below) to the extent he would not have done the work entitling him to forgiveness until after the divorce. Husband asserted generally that although he received the loan proceeds and a commission-based salary, he really only netted about $65,000 in income each year.

Wife, on the other hand, contended that the $1.3 million payment was a "retention bonus" that UBS structured, for tax purposes, as a loan with payments due over a period of years. Wife testified that Husband had referred to these payments at the outset as a "signing bonus," and only began calling the payments a "loan" once the divorce proceeding

_____

[1] A handful of similar payments were scheduled for later dates, two of which had a "transition date" before the parties separated in July 2012, and the nature of these payments was also in dispute. By the time the parties separated on July 1, 2011, Husband had received total payments under the Letter totaling $1,667,000, nearly $300,000 of which had been forgiven. As of the time of the trial court's opinion, Husband had received over $2 million in "incentive payments."

was underway. (For clarity, we refer to the payments that Husband received from UBS through the course of the marriage as the "UBS payments.")

Wife worked as a secretary after graduating from high school, and continued to work after they married and through the birth of their two children. By 2000, she was earning about $60,000 a year. In 2001, she and three friends started a company, Intuitive Business Concepts, Inc. ("IBC"), that was successful: each partner received an annual salary of $104,000, along with partnership distributions and other benefits that, at their peak, yielded a salary of $145,000. After she tried to sell her interest in the business in 2006, she became embroiled in a dispute with her partners and ultimately settled with IBC, exchanging her interest for a series of payments totaling $280,000 over three years. Wife testified that she and Husband put all this money toward living expenses.

Wife took a year off from working to comply with a non-compete she signed with IBC.[2] In September 2008, she took a job as an independent contractor for the Accrediting Council for Independent Colleges and Schools ("ACICS"). At the time of trial, she worked approximately twenty-four hours a week and billed $125 an hour, but received no benefits or reimbursements. Wife testified that she has looked for a full-time job, and the maximum potential full-time salary she had found was about $110,000 a year—approximately

---

[2] Wife also claimed at trial that she exited IBC to spend more time with her children: Husband had "always told me I'd be able to stay home from work because he would be able to take care of me and he'd make a lot." Husband, on the other hand, testified that he had "no idea" that Wife planned to retire after she left IBC.

$15,000 more than she was making. She also spent about sixteen hours a week working (unpaid) at the bar she and Husband acquired years ago which, as we discuss next, became a significant problem in the parties' relationship.

## 2. Park Place Adventures, LLC & its investments.

To realize his "life long dream" of owning his own bar, Husband formed, on January 1, 2010, a limited liability company, Park Place Adventures, LLC ("Park Place") that purchased a Severna Park restaurant called Snyder's. (The business later changed the name of the bar, and we refer to it generally as "the bar.") Husband intended to share ownership in Park Place with two of his UBS clients, Mark Tinordi and Jeffrey Kogok, but discovered shortly before forming it that UBS prohibited him from investing with his clients. To circumvent this problem, he placed a fifty-one percent interest in Park Place in Wife's name and he held no membership share at all. Ironically, Wife had no interest in buying the bar, and testified that she "knew it would tear the family apart" because, as she saw it, it would give Husband opportunities to stay out late and drink with friends. She allowed Husband to put Park Place (and by extension, the bar) in her name, though, because she was concerned that even more problems would follow if the ownership share went to one of their children. Park Place purchased Snyder's on December 31, 2010. Husband financed the purchase by obtaining a UBS equity line of credit using his UBS payments as collateral and then borrowing about $1.4 million from the line of credit.

The haphazard organization of Park Place may have contributed to the problems that followed. As Mr. Kogok explained, "the whole partnership agreement was sort of a

4

last-minute thrown together [deal], as far as I can tell." Mr. Kogok testified that he initially invested a quarter-of-a-million dollars in Park Place, and put in another $150,000 within the year-and-a-half before trial. He did not investigate the details of the partnership or its management of the bar. When asked about whether he had approved the provision in the partnership documents that prevented members from selling their shares without unanimous consent, he admitted to signing off on it: "Again, I did a sloppy job and I just signed off on the thing because it was kind of after the fact and, again, I had complete faith in [Husband]."

Everyone agrees that Husband changed the bar's name in 2011 to "Hot Rodz & Rydz," but they dispute many of the facts surrounding its management and finances. Wife says that she found out when the parties began the divorce proceeding that employees' paychecks were bouncing, and she had major concerns about how it was run. At that point, she took over the bar, cut a number of other benefits, and cleaned up the bar's finances. Mr. Tinordi, who had been a client of Husband for about ten years, testified that once Wife took over, the restaurant (whose name changed again, this time to the "Severna Park Tap House") started making money. Mr. Tinordi had a falling-out with Husband about Husband's poor management of the bar,[3] and at the time of trial Mr. Tinordi was working there about five days a week, without salary, in an effort to help turn it around.

---

[3] This falling-out extended to Mr. Tinordi's investments with Husband; Mr. Tinordi received a call from UBS at some point telling him that his money would be handled by another financial advisor.

Husband argued at trial that Park Place had a fair market value of $800,000 (based largely on its ownership of the Severna Park Tap House and the land on which it sat). He claimed that he was entitled to 77 percent of Wife's interest in the value of Park Place (which, he claimed, was purchased with a loan collateralized by the proceeds of the UBS payments), reasoning that he had not yet repaid 77 percent of the UBS payments as of the date of the divorce.

### 3. The parties' lifestyle.

As Husband's earnings increased, the couple's lifestyle changed too. The court described it as "lavish," and their purchases backed up that characterization. Husband also appears to have displayed great magnanimity in sharing his wealth, both before and after the marriage ended; the former time period mattered to the parties' standard of living during the marriage, and the latter period bore on the court's analysis of whether Husband had dissipated marital assets after they separated:

Pre-separation

- The parties bought their house in May 2007 for $900,000, and bought the adjoining lot in order to build a swimming pool. As of the time of trial, neither Husband nor Wife was making mortgage payments on the house.

- The parties owned thirteen vehicles valued at nearly $250,000.

- The parties bought permanent seat licenses to Ravens' games worth $20,000.

- The family enjoyed luxury vacations to Jamaica, the Bahamas, and ski resorts, as well as regular summer vacations.

6

<u>Post-separation</u>

- In September 2011, Husband bought a house for a daughter by his first marriage, which she transferred to his first wife, who took out a mortgage on the property. Husband bought the house back from his ex-wife after it went into foreclosure.

- Husband bought a car for a friend's use and paid the insurance on it.

- Husband gave a boat to his son, who then sold it for $10,000, a price Husband thought was far too low.

- Wife testified that after the divorce proceedings were underway, Husband began to cash in his retirement accounts. He withdrew nearly $50,000 each in April and May 2011, and withdrew over $180,000 in September that he gave to his daughter and son-in-law to buy a house.

- The court found that Husband spent over $2,500 a month on "dining out and alcohol," and noted that at trial, Husband could not account for more than $90,000 that he had spent between February 2013 and July 2013, other than to call them "living expenses." The court also found that he spent several thousand dollars on jewelry for himself and his girlfriend.

The parties carried significant debt and Husband used the UBS payments to pay it off. The court found that "[i]t is clear that this money received [from UBS] was used by the parties during their marriage to support their lifestyle."

**4.    The marriage dissolves.**

The parties disagreed about which of them brought about the deterioration of the marriage, but the trial court attributed it largely to Husband's partying, drinking, and philandering. Although Wife conceded that she had used drugs with Husband on occasion, she said that this took place only when he brought drugs into the house. (Husband argued that Wife, too, lived well, but the trial court did not appear to find his testimony in this

7

regard significant or credible. [4]) Wife testified that Husband had "another life going on [that she] didn't know about," which included heavy drinking, drug use, and affairs. He was rarely home at night, and she testified that she suspected he was with other women.

The marriage was volatile well before the couple separated for the last time. Wife testified that in 2006, she got a phone call in the middle of the night from a woman claiming to be Husband's girlfriend. Husband was out of the house, and Wife tracked him down by calling *another* romantic interest of Husband, with whom he was out at the time. Wife threw his belongings onto the front lawn and he moved out of the house, but they reconciled several months later. Mr. Kogok recalled admonishing Husband at one point that he should not be staying out so late, and should be spending evenings at home with his family.

The parties separated for good on July 1, 2011.[5] Wife filed for divorce in June 2012.

### 5. Proceedings in the trial court.

The court held a four-day hearing in July 2013, at which Husband, Wife, and numerous other witnesses testified, and issued a written opinion that was docketed on October 9, 2013. The court granted Wife's request for divorce, and considered separately child support, alimony, marital property, dissipation of assets, and use and possession of

---

[4] Husband accused Wife generally of infidelity, drug use, and other immoral behavior, but did not point to any specific incidents that he claims played a part in the break-up of the marriage.

[5] The record reveals that they had sexual relations through December 2011, although the court ultimately found that they no longer lived under the same roof as of that July.

8

the home, along with Wife's claim for attorney's fees. The court's forty-one page written

opinion made detailed findings of fact and decided numerous disputed issues by the parties.

Among other things, the court found that Husband "lack[ed] credibility" overall, pointing

out that "[h]is testimony was substantially challenged." It lay the blame for the marriage's

deterioration almost solely at Husband's feet: "The Court also finds that this is a rare case

in which the 'circumstances that contributed to the estrangement of the parties' weighs

heavily in that, but for [Husband's] actions and mistakes, particularly his substance abuse,

proclivity for other women, and late night partying, the marriage might still be intact."

We discuss the trial court's specific factual findings in greater detail as necessary

for our analysis, but highlights included the following decisions:

- The court awarded use and possession of the family home to Wife, at least until their youngest daughter graduated from high school or turned nineteen;

- The court found that Husband had failed to disclose and had dissipated assets, spending over $2,000 per month on food and drink for the six months leading up to trial, and over $90,000 in that same time period on undefined "living expenses";

- The court valued Wife's interest in Park Place at $76,710 (adopting Wife's expert's proposed valuation, as opposed to Husband's expert, who put the value of her interest in the business at over $400,000).

- The court awarded Wife $78,000 to account for Husband's decision to finance the purchase of a home for his daughter with proceeds from his IRA/Retirement account, and nearly $132,000 "as an adjustment of the equities between the parties" (which the court backed up with a chart explaining its rationale);

- The court awarded indefinite alimony to Wife of $4,500 per month;

- The court ordered Husband to pay child support of $4,927 per month; and

- The court awarded attorney's fees to Wife in the amount of $65,000.

9

Husband filed a Motion to Reopen the Case, along with a Motion to Alter or Amend. The court denied both on November 18, 2013. Husband filed a timely Notice of Appeal on December 9, 2013, and Wife filed a cross-appeal on December 13, 2013.

## II. DISCUSSION

Husband attacks the circuit court's first- and second-level findings of fact and conclusions of law. The standard of review differs for these varied conclusions, and we look at the decisions through different lenses depending on their character. But overall, Husband attacks the trial court's decisions—from the character of the UBS payments to its broader decision to award indefinite alimony—as punitive rather than grounded in fact, and that theme runs through his whole brief. [6] We disagree. As Husband contends, it would

---

[6] Husband raises the following specific questions on appeal:

I. Did the court err when it failed to consider the significant debt of more than $1.2 million dollars that husband had at the time of trial and instead declared this debt was "income/marital assets" despite the uncontradicted evidence at trial that this debt existed and was analogous to unvested assets?

II. Did the court abuse its discretion in granting Wife indefinite alimony when the testimony and evidence showed that Husband had no ability to pay alimony, Wife was self-supporting, Wife failed to prove an unconscionable disparity in standards of living if alimony was not awarded, the court focused on a period six months prior to separation to determine the parties' pre-separation "standard of living" based on debt, and in light of the two monetary awards and other property transferred to Wife?

10

have been improper for the court to award indefinite alimony as punishment for how he behaved over the course of the marriage. But that is not what happened; instead the court made credibility findings that it then used to support its legal conclusions.

Specifically, the court found Husband's testimony not to be credible in a number of areas: *first*, his lifestyle (both when he was married and after the separation); *second*, his role in Park Place and the limited success of the bar; and *third*, his assertions that the UBS payments constituted loans that Husband never considered income. The court's view of Husband's credibility in all those areas necessarily, and appropriately, affected its conclusions (and therefore we recount Husband's testimony in those areas in some detail here and above). Because the court's factual findings were not clearly erroneous, and because its disposition of the case—including those issues raised in Wife's cross-appeal— fell within the bounds of the circuit court's discretion, we affirm.

---

III. Did the court err when it failed to find a constructive/resulting trust for Husband's interest in the bar when all funds came from loans Husband was solely responsible for, Husband was the party who worked to rehab the bar and hire personnel and the testimony supported the parties' intention that Husband own the bar?

IV. Did the Court err when it found Husband in contempt in the absence of any intent by Husband to violate a court order and failed to credit Husband for the $9,827.63 which Husband could not pay from the agreed upon account when Wife's sole debt and failure to pay her credit card resulted in UBS garnishing that amount from the account?

11

**A.** **The Trial Court Did Not Abuse Its Discretion When It Awarded Wife Indefinite Alimony.**

Maryland's statutory scheme favors fixed-term, "rehabilitative" alimony rather than indefinite alimony. *See Blaine v. Blaine*, 336 Md. 49, 68 (1994). But a court may award indefinite alimony in two different circumstances, one of which is at issue here: where, "even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate." FL § 11-106(c)(2).

We review indefinite alimony awards at more than one level. *First*, we review the trial court's findings of fact as to questions such as *what* a party's income is (referred to as "first-level" facts) and reverse them only if clearly erroneous. *Wenger v. Wenger*, 42 Md. App. 596, 607 (1979). *Second*, while the question of whether the standards of living between spouses will be unconscionably disparate is a factual one as well, *Whittington v. Whittington*, 172 Md. App. 317, 337 (2007), it is not a "first-level" fact:

> It is a second-level fact . . . that necessarily rests upon the court's first-level factual findings on the factors [in FL § 11-106(b)] that . . . are relevant to all alimony determinations, and "all the factors . . . necessary for a fair and equitable award"; and upon how much weight the court chooses to give to its various first-level factual findings.

*Id.* at 337-38 (quoting FL §11-106(b)). Whether or not economic disparity will exist in the future requires the trial court to "projec[t] forward in time to the point when the requesting spouse will have made maximum financial progress, and compar[e] the relative standards of living of the parties at that future time." *Francz v. Francz*, 157 Md. App. 676, 692 (2004)

12

(citing *Roginsky,* 129 Md. App. at 146); *see also Blaine*, 336 Md. at 64 (noting that the statutory language "in effect requir[es] . . . the court [to] make a prediction as to the success of the dependent spouse's efforts to become self-sufficient").

A mathematical disparity, standing alone, does not mandate indefinite alimony— the FL § 11-106(b) factors drive the analysis. *Ware v. Ware*, 131 Md. App. 207, 232 (2000). "The interplay of those factors may frequently have a strong bearing on whether a particular disparity can fairly be found to be an unconscionable disparity." *Id.* at 232-33; *see also Innerbichler v. Innerbichler*, 132 Md. App. 207, 248 (2000) (affirming indefinite alimony award, noting that "unconscionable equitable disparity is more than a numerical calculation" (citing *Ware*, 131 Md. App. at 229), and affirming trial court's "careful analysis of the various equitable considerations"). The factors cover a wide range of considerations about the parties and their earning capacity:

> (1) the ability of the party seeking alimony to be wholly or partly self-supporting;
>
> (2) the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;
>
> (3) the standard of living that the parties established during their marriage;
>
> (4) the duration of the marriage;
>
> (5) the contributions, monetary and nonmonetary, of each party to the well-being of the family;
>
> (6) the circumstances that contributed to the estrangement of the parties;

(7) the age of each party;

(8) the physical and mental condition of each party;

(9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

(10) any agreement between the parties;

(11) the financial needs and financial resources of each party, including:

> (i) all income and assets, including property that does not produce income;
>
> (ii) any award made under §§ 8-205 and 8-208 of this article;
>
> (iii) the nature and amount of the financial obligations of each party; and
>
> (iv) the right of each party to receive retirement benefits; and

(12) [other considerations not relevant here.]

FL § 11-106(b).

Husband attacks several parts of the court's decision on indefinite alimony, and we organize his complaints slightly differently than he did in his brief. We look *first* at whether the trial court's finding that the UBS payments were not loans but actually incentive bonuses was clearly erroneous; *second*, whether the court erred in finding (as part of its examination of the FL § 11-106(b) factors) that Wife was partially self-supporting and that Husband had the ability to pay alimony, and whether it examined the correct standard of living; and *third*, whether the court abused its discretion in finding an unconscionable

14

disparity, which supported the ultimate decision to award indefinite alimony under § 11-106(c).

### 1. The trial court's characterization of the UBS payments.

Husband contends that the trial court erred in finding that the UBS payments constituted marital property rather than a loan. He claims specifically that UBS characterized the payments as loans, and that portions of the loan would only be forgiven if he continued to work at UBS. He points to Schedule F, which he introduced at trial, as demonstrating that 77 percent of the UBS loan paid to him as of the date the parties separated ($1.67 million) remained outstanding ($1,286,720). That is, he had yet to pay back this money, and in his view, it does not constitute marital property because he will not actually acquire *ownership* of those funds until the entirety of the loan is forgiven, something that would not happen until November 2019, and only then if he remains employed by UBS. He complains that the court simply did not believe him, and from there the court's characterizations of the UBS payments were clearly erroneous.

Wife counters that whatever label attaches to the UBS payments, the fact is that UBS paid Husband "over $2.2 million between November 2010 and February 2013," and that the payments were structured for tax purposes. She also points out that the trial court's findings regarding Husband's income were bolstered by the fact that he earned additional income above and beyond the UBS payments—for example, his paystub from July 2013 reflected that he earned over $238,000 in the first half of that year.

15

The trial court did not err when it characterized the UBS payments as income. The court became keenly aware of the unusual circumstances surrounding this unusually large payment and its complicated structure, and considered the testimony of Husband's experts, but also looked through that testimony to conclude that the payments really served as an incentive rather than a loan:

> This case presents a special issue of how to treat the extra or additional income received by [Husband] with his work at UBS. After the testimony of the parties and both parties' experts, *it is the Court's opinion that these payments are in fact "bonuses" or "incentive payments" and should therefore be treated as an asset*. [Husband's] own expert, Mr. Estabrook, stated that [Husband's] so-called "loan" is "forgiven for services rendered" each year. Furthermore, after review of the relevant documents and testimony, the Court is aware that *the actual amount of money [Husband] owes under the terms of the "Promissory Note" is actually offset by the amount he receives on a concurrent date under the relevant "Transition Agreement,"* which includes the accrued interest. Under the terms of the Transition Agreement, UBS actually pays [Husband] an amount to cover both the "loan" payment and the applicable interest that is owed on such payments on the date it becomes due. . . . [Husband] is therefore paid to pay back the loan, and does not expend anything out of his own funds, except the taxes on the year the transition payment is received. *[Husband] himself stated that "we always lived off the loan," indicating that the parties used it as a source of income.*

(Emphasis added.)

Husband claims that the trial judge erred in not crediting his version of the loan, and that the judge "made it clear he did not believe a thing that Husband said." But this was the trial court's prerogative. Husband presented an expert who attempted to establish that the loans were "debts," but the court was free to discount his testimony or not to credit it at all.

16

*Walker v. Grow*, 170 Md. App. 255, 275 (2006) ("The weight to be given the expert's testimony is a question for the fact finder.") We agree with Husband that "only assets acquired during the marriage are marital." FL §8-201(e)(1). But we disagree with his claim that under *Harper v. Harper*, 294 Md. 54 (1982), he "obtained possession of the . . . loan during the marriage, [but] did not acquire ownership in that portion of the funds until the anniversary date over the next nine years." Nor does the label UBS and Husband put on the payments compel us to override the circuit court's findings, particularly when Husband and Wife did not just "possess," but actually *spent* the proceeds during the marriage, a reality that characterizing them as loans would ignore.[7]

Husband also cites *McCleary v. McCleary*, 150 Md. App. 448 (2002), a case in which the husband incurred significant debt during the marriage and argued that the trial court's marital property award (of more than $2 million) failed to account for his negative net worth. We reversed, reasoning that the court had, in fact, failed to consider the husband's $4.6 million liability to his former company, and also did not account for over $1 million in tax liability. *Id.* at 459-60. Husband argues that *McCleary* should have

---

[7] In *Harper*, the Court of Appeals held (in connection with real property, but the definition applies equally here) that the term "acquired" in the statute means that "characterization of property as nonmarital or marital depends upon the source of each contribution as payments are made, rather than the time at which legal or equitable title to or possession of the property is obtained." *Harper v. Harper*, 294 Md. 54, 80 (1982). But again, adopting Husband's argument would require us to supersede the trial court's factual findings with a finding of our own that some part of the UBS payments did not constitute non-marital property, a leap we decline to make.

compelled the trial judge here to "recognize . . . Husband's debt," which in turn would have led the trial court to conclude, "as the [Court of Special Appeals] did in *McCleary*, that [Husband] was insolvent and had a negative net worth." But Husband oversimplifies that case and skips an essential analytical step: in *McCleary*, the husband had introduced specific evidence of indebtedness. Here, on the other hand, the arrangement has a very different structure, and the Letter of Agreement specifically contemplates that UBS will forgive the outstanding sums as Husband continues in his job (the record does not suggest, nor does Husband argue, that he has any intention of leaving early). Unlike *McCleary*, the character of Husband's financial relationship with UBS was in dispute from the beginning, and we disagree that the court abused its discretion in resolving those disputes as it did.

### 2. FL § 11-106 factors

Husband claims that the trial court reached incorrect conclusions about several of the factors it was required to consider in the indefinite alimony equation. *First*, we disagree that the court erred in concluding that Wife was only partially self-supporting (per § 11-106(b)(1)). Although Husband attacks a number of the specific entries on Wife's financial statement, it is not our job to second-guess the circuit court's fact-finding. And the court's reasoning was based not just on the financial statement, but also on Wife's testimony about the jobs that were reasonably available to her in her area of expertise. Husband attempts to suggest that the court "accepted the fact that Wife was only working *part-time* (between 24 and 30 hours a week)" (emphasis in original), but that is not, in fact, what the court said. The court explained that Wife "works approximately 32-25 hours per week (not including

18

the 16 hours per week she works at Severna Park Tap House, with no pay). *Due to the nature of her business, and the travel time and so forth, she is only able to bill approximately 24 to 30 hours per week.*" (Emphasis added.) The court hardly failed to "do the math": it simply saw the facts differently than Husband did. Indeed, even Husband's expert agreed that "nobody is capable of billing all of their hours. Everybody puts in additional hours beyond the amount that they're billing."

The court also was free not to credit the claim by Husband's expert, Steve Shedlin, that Wife could make a net income of about $110,000 a year (or "obtain full time employment for about $104,000.00 per year for 40 hours per week.)" The court pointed out that Mr. Shedlin served as a vocational rehabilitative expert, and that his work "usually involves assisting persons with disabilities to find full-time employment."[8] Mr. Shedlin never interviewed Wife, and did not limit his research to Wife's specific area of expertise.

Wife points out, too, that the trial court's conclusion was not far off Mr. Shedlin's in any event, so to the extent the trial court might have made any mathematical errors (and we do not agree that it did), they were harmless and had no effect on the bottom line. Mr. Shedlin testified that Wife could earn in the range of $180,000 to $242,000 per year if she

---

[8] Although Husband complains that the trial judge improperly believed "everything Wife said," and "stretched to give Wife every benefit of [the] doubt," the trial judge's role is to assess the credibility of the parties. The court was not required to find Mr. Shedlin credible merely because he was an expert; that finding, which we agree appeared often in the trial court's opinion, obviously affected how the court viewed the evidence and framed the factual conclusions it reached.

were self-employed, but he also agreed on cross-examination that "if she works for somebody else, she gets a job and she doesn't go out and open up on her own and have to incur all of her own expenses, she can make $110,000 a year." He conceded that the salaries for the jobs available to Wife fell in the range of $85,000 to $105,000. And this backed up Wife's testimony, and her exhibit from a website that she claimed was the "go-to" website for finding jobs in her area, that she only had the ability to earn between $85,000 and $104,000, the maximum earning capacity in her field. The trial court also found Wife's testimony about her billing rates "compelling." We see no abuse of discretion in the court's decision to adopt an earnings figure for Wife in the lower end of the range Husband's expert proposed.

*Second*, we disagree with Husband that the court did not properly assess the parties' standard of living during the marriage pursuant to FL § 11-106(b)(3). Although the court may have muddied slightly the period of time it considered when establishing their standard of living, this really bore on whether Husband dissipated assets, a question not before us. The court supported its findings by citing numerous facts demonstrating that the parties enjoyed a high standard of living during the marriage, not just by Husband after they separated. The court specifically noted the purchase of the bar and a million-dollar home, jewelry and other luxuries, and family vacations and entertainment expenses, and Wife's testimony was consistent with his in this regard. (She explained that when she and Husband were married, "[w]e weren't really wanting for anything. We got to go to

20

[restaurants] and basically wherever we wanted.") We will not disturb these first-level factual findings on appeal absent clear error, and we perceive none.

*Finally*, the court did not err when it disagreed with Husband's (purely factual) claim that he lacked the ability to pay alimony under FL § 11-106(b)(9). Again, Husband's expenditure of $90,000 for undefined "living expenses" over the six months preceding trial was relevant primarily to the question of whether he dissipated marital assets. But those payments also bore on whether he had an ability to pay alimony, and the fact that he could not account for that much money over a six-month period gave the court more than adequate reason to believe that he *could* have paid, but chose not to.

Husband also is incorrect that the trial court inappropriately awarded alimony as a punitive measure. *See Strawhorn v. Strawhorn*, 49 Md. App. 649, 657 (1981) ("Even though culpability can be considered in the granting or denying of alimony, alimony cannot be awarded strictly as a punitive measure."), *vacated on other grounds*, 294 Md. 322 (1982). Even in *Strawhorn*, we reiterated that "[t]he fault that destroyed the marital relationship can be considered [as an element of an award] when it affects the economic needs of the party seeking alimony," *id.* (citing *Kingsley v. Kingsley*, 45 Md. App. 199, 209 (1980)), and that is all the court did here. Wife testified, for example, that she had no interest in purchasing the bar that ultimately became not just a source of marital discord, but a significant drain on their finances. The court acted well within its discretion in finding that Husband was the driving force behind that decision and more responsible for its impact, and that he was at fault in many other ways for the relationship's breakdown. These

21

decisions might have had a detrimental *effect* (in Husband's view) on the overall outcome, but the court's reasons were appropriate under the law (not least because Husband's inability to pay was caused by his own failure to set aside any part of the UBS payments for even the short-term future).

### 3. The court did not err in finding an unconscionable disparity.

Husband claims that "[t]he evidence is glaring that should [Husband] stop working for UBS, he would be obligated to repay all of the sums received from the date his employment ceased through the end of the term of the loan." We review the finding of unconscionable disparity as a question of fact and under a clearly erroneous standard. Maryland Rule 8-131(c). Then, we review the decision to award indefinite alimony under an abuse of discretion standard. *Roginsky v. Blake-Roginsky*, 129 Md. App. 132, 143 (1999).

The court based its decision to award indefinite alimony here not just on the UBS payments, but on other factors under FL § 11-106(b) that Husband fails to mention. *First*, as to whether Wife could become self-supporting (FL § 11-106(b)(2)), the record supports the court's finding that Wife could not gain more education or training to allow her to enter a more lucrative profession without sacrificing her current profession: "Obtaining these additional certifications or ongoing continued education programs, however, will come at a cost to her. In addition, as a business owner, she would be required to take time off from work in order to go forward with any of these certification or continuing education

22

programs, which would cause her to lose additional salary, on top of the out-of-pocket costs for such classes or programs."

*Second*, as to the parties' "contributions to the well-being of the family," (FL § 11-106(b)(5)), while both parties contributed to the marriage by working, they agreed at trial that Wife had assumed primary responsibility for helping the children with homework, taking them to after-school activities, and generally tending to their day-to-day needs. The court pointed out that Husband did coach some of the children's sports teams, but also noted Wife's testimony that Husband "often stayed out late, liked to party and drink and sometimes would not come home"–behavior that played a major role in the relationship's breakdown.

*Third*, as to the "circumstances that contributed to the estrangement of the parties," (FL § 11-106(b)(6)), the court blamed Husband for the deterioration of the marriage, both generally and as it examined this factor in the context of indefinite alimony. Although Husband obviously disagrees, this is a factual finding that was supported by the record and that was not clearly erroneous. The court noted Husband's "history of inappropriate interactions with other women," and the confrontation in February of 2006 that led to the first separation. The court summed it up well:

> Although multiple witnesses testified to the tumultuous
> relationship of the parties throughout the years, the testimony
> of both parties and other witnesses leads this Court to believe
> that the nature of this "volatile" relationship was mainly due to
> [Husband's] inappropriate behavior throughout the duration of
> the marriage. Therefore, it is appropriate for the Court to draw

23

the inference that [Husband's] behavior was what ultimately led to the break-up of the marriage.

The court also pointed to the fact that Wife had no opportunity to save for retirement, whereas Husband had "a valuable deferred compensation plan, retirement and pensions benefits and stock options through his employment at UBS." The court took into account numerous factors in concluding that "equity and justice and [Wife's] financial needs make her a candidate for alimony," and the trial court properly considered and weighed the indefinite alimony factors.

**B.      Husband Did Not Ask The Trial Court To Find A Constructive Trust.**

Husband claims that he asked the trial court to create a "constructive trust" for him in the bar as an equitable solution to what he views as Wife's unfair majority ownership in Park Place. He claims that, as a matter of fact, he funded the purchase of the bar, did the work to refurbish it, and that he should reap the benefits of ownership. We agree with Wife, though, that Husband waived this argument early in the trial (if it was properly before the circuit court at all). At the beginning of his opening statement, counsel for Husband raised the issue of a constructive trust, but he did not actually ask the court to *do* anything in connection with it:

> Your Honor, before we begin, . . . [f]irst of all, as the Court may have been aware of from reviewing the file, there was a separate lawsuit that my client had filed against [Wife], seeking the Court to establish a constructive trust of the LLC interests that are in dispute in this case. It was denied recently by [a different judge.] We just wanted to for the record object to that. We believe that the basis that we set forth in that

24

original motion asking the Court to consolidate that case with this case is appropriate. So if the Court would like any further on that or I can prepare to move on, as well. I just want it known for the record that we are objecting to the Court's denial of the consolidation with the constructive trust case with the divorce.

Wife's counsel replied that the issue had been decided by another judge, in a ruling that the trial judge hearing the divorce proceeding did not have "any right to reconsider," and Husband had not filed a motion to reconsider in the other case. Wife's counsel replied that "[Husband] may not like it, but until they file a motion to reconsider with the Court—an appeal or something like that, the ruling stands," and Husband's counsel conceded the point: "Understood, Your Honor. I wanted to put that on the record. That's all."

We do not really see the purpose of counsel simply putting this on the record, and if anything his specific mention of it, without actually seeking the remedy of a constructive trust, effectively waived the issue.[9] Moreover, although Husband *did* ask the court to award him 77% of the property under the marital award, that was a different request and one that the court adequately considered.

Even if we were to consider the argument, though, Husband would lose on the merits. He cites *Gosman v. Gosman*, 271 Md. 514, 517-18 (1974), but overlooks an important and distinguishing factor: there, as even Husband concedes, "the parties had no

---

[9] That another judge had already denied Husband the remedy he seeks here suggests that *res judicata* might bar the trial court from considering the issue, too, but that question has not been raised before us.

written agreement as to their ownership interest" in the disputed property. Here, on the other hand, the Park Place LLC agreement (that Wife only entered into reluctantly, and at Husband's behest) affirmatively vested majority ownership in her *in order to circumvent ethical limitations imposed by Husband's employer*. We find it inappropriate to look to extrinsic evidence for the purposes of (a) establishing an "intent" that contradicts the unambiguous documents, and (b) giving Husband the benefit, via court order in an equitable proceeding, of a financial relationship he could not ethically have entered.[10]

### C. The Trial Court Properly Found Husband In Contempt For Failing To Pay Child Support.

In February 2013, Husband received a payment from UBS totaling $600,000. Wife testified that despite receiving this money, Husband had not kept current with his child support payments and was $11,064 in arrears at the time of trial. The court agreed, and found Husband in contempt of the parties' consent order. Husband appeals that decision,

---

[10] Husband's citation to *Levin v. Levin*, 43 Md. App. 380 (1979), likewise fails to help him. There, we held that where a couple had invested jointly in a liquor store, but only the husband's name appeared on the lease, the wife could still share in the benefits of ownership by way of a "resulting trust." We explained that a "resulting trust is an implied trust which rests upon the presumed intention of the parties," and that a trial court can effectively create such a trust when one party furnishes consideration, but the other takes legal title, "provided the circumstances surrounding the transaction do not demonstrate a contrary intention by the parties." *Id.* at 387. But the court pointed out not only the heavy burden borne by a party seeking to establish a resulting trust, but also reiterated that the question for the chancellor there (the fact-finding equivalent of the trial court here) was a factual one: "We must accept the chancellor's findings of fact unless they are clearly erroneous," and "[t]he credibility of the witnesses was for him to determine." *Id.* at 386. So *Levin*'s applicability depends entirely on factual findings that, in this case, do not support Husband's argument.

arguing that he had already made the payment by depositing it into an account the parties had designated for child support payments, but that Wife's failure to pay a credit card led the creditor (UBS) to take money out of the account directly.

Again, this finding was entirely one of fact, and we do not disturb the trial judge's decision unless clearly erroneous. The court explained its reasoning: Husband had been ordered to pay Wife a total of $56,000 in child support under the consent order, representing four months of arrears and advance support payments for December 2012 through March 2013. Wife testified that Husband still owed over $11,000. Husband argued that UBS had automatically removed nearly $10,000 from a credit card account where Husband had placed the support payment, and that he should not be punished by having to "double-pay," when Wife was at fault.

Husband's position at trial, and here, suggests a certain arrogance that may well have come through to the trial court, given its credibility findings. It is not up to *Husband* to determine whether a garnishment by a third party constitutes a payment of his child support obligations, when the Consent Order required that he pay child support directly to Wife. We will not substitute our own judgment for that of the trial court.

### D. We Will Not Consider Issues Raised For The First Time In Husband's Reply Brief.

In response to Wife's eighteen-page merits brief, Husband submitted a twenty-seven page reply brief in which he not only attempted to rebut Wife's responses to *his* issues on appeal, but also raised new issues that we will not consider here. The purpose of a reply

brief is to *reply* within the boundaries established by first, the appellant's brief and then, more narrowly, the appellee's brief. *See Federal Land Bank of Baltimore, Inc. v. Esham*, 43 Md. App. 446, 459-60 (1979) ("The reply brief must do what it purports to do: it must respond to the points raised in the appellee's brief which, in turn, are addressed to the issues *originally* raised by the appellant."). Here, though, Husband newly attacked the court's finding that he dissipated marital assets and, for the first time, disputed the trial court's calculations in that regard. He did the same thing when he claimed that the trial court "erred in valuing various assets used in its monetary award calculation," and in attempting to revive factual questions about litigation between Park Place and the Verizon Center about the alleged purchase of a skybox, especially when he attached documentation that did not appear in the trial court here (which, incidentally, would have been equally improper if it had been attached to his original brief). He mounted a new challenge to the trial court's transfer of a Porsche to Wife. And he argued that the child support award is incorrect for the *additional* reason that Wife made misrepresentations on her financial statement regarding claimed expenses for the couple's daughter.

None of these arguments appeared in Husband's opening brief, which raised narrow appellate questions about the character of the UBS payments, the award of indefinite alimony, and the contempt finding. Had we reversed or vacated the trial court's decisions on any of those issues, that decision would have required us to vacate the court's other financial decisions. But we are affirming the trial court's findings on the issues Husband

28

properly challenged, and we will not disturb any other parts of the court's opinion, least of all the parts that Husband did not attack until too late in the game.

### E. Wife's Cross-Appeal

Wife filed a cross-appeal in which she argues that the trial court erred when it used the wrong figure for alimony on the child support guidelines worksheet. Of course, in an "above-guidelines" case like this, the child support guidelines are advisory, and the trial court specifically (and correctly) recognized that it had discretion to set child support and, as courts often do in these situations, the court extrapolated a "possible child support level consistent with [Husband's] high income." *See* FL § 12-204(d) ("If the combined adjusted actual income exceeds the highest level specified in the [basic child support obligation] schedule, the court may use its discretion in setting the amount of child support.") The court considered the children's "economically privileged" circumstances in reaching an ultimate figure of $4,927 per month. The change Wife seeks would have increased Husband's monthly payment by less than $200, and the need for these payments has been eliminated by the only minor child's eighteenth birthday on April 28, 2014. We decline to disturb the court's discretionary decision now.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**